**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Nancy Perryman, )
)
Plaintiff, )  No. CV-01-0927-PHX-PGR
vs. )
)
Provident Life and Accident )  OPINION and ORDER
Insurance Company, )
)
Defendant. )
_____ )

Plaintiff Nancy Perryman ("Perryman") brings this action to recover long-term disability benefits she alleges were wrongfully denied her by defendant Provident Life and Accident Insurance Company ("Provident"). The action is before the Court for its *de novo* review of Provident's denial of benefits pursuant to the Employment Retirement Security Income Act of 1974 ("ERISA"). Having considered the parties' memoranda, the evidence of record, and the oral argument of counsel as presented at the bench trial of this action, the Court finds that Perryman is entitled to recover long-term disability benefits from June 1, 1999 through the date of her 65th birthday.[1]

_____

[1]
        This Opinion and Order is being entered pursuant to Fed.R.Civ.P. 52.
The Court sincerely apologizes to the parties for its inordinate and unacceptable

<u>General Background</u>

Perryman stopped working on February 28, 1997 due to her illness; she was then 55 years old. At that time, she was the Western Farm Bureau Insurance Company's agency manager for the metropolitan Phoenix and Northern Arizona areas, supervising some 18-21 insurance agents working out of 12 offices. She was then licensed both as a Chartered Life Underwriter and Chartered Life Financial Consultant. She was not paid a salary, but received commissions of up to some $300,000 per year; her average monthly earnings for the two years before she stopped working were $18,966. Perryman's whole working career was with Western Farm Bureau, which she started working for in the 1970s as a filed agent. She has a high school education with one year of college. She stayed at home as a homemaker for 17 years before entering the work force.

Perryman, alleging that she was disabled from working due to chronic fatigue syndrome ("CFS")[2] as of March 1, 1997, filed a claim for long-term

delay in entering this opinion.

[2]    The Centers for Disease Control ("CDC"), in its revised guidelines for CFS set forth in its website, states that

chronic fatigue syndrome is a clinically defined condition ... characterized by severe disabling fatigue and a combination of symptoms that prominently features self-reported impairments in concentration and short-term memory, sleep disturbances, and musculoskeletal pain. Diagnosis of the chronic fatigue syndrome can be made only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded. No pathognomonic signs or diagnostic tests for this condition have been validated in scientific studies ...; moreover, no definitive treatments exist for the

- 2 -

disability benefits in April, 1997.  At that time, Perryman was insured under an ERISA-governed group disability insurance policy, LTD Policy #120057, issued by Provident to her employer.  Provident determined in January, 1998 that Perryman was unable to perform her former job due to her disability and began paying her disability benefits, retroactive to June 1, 1997, pursuant to the policy's two-year "own occupation" provision.  Provident terminated the payments as of May 31, 1999, due to its determination that Perryman was not disabled from working under the policy's "any occupation" provision.

Pursuant to the parties' stipulation, the Court has permitted the administrative record to be supplemented by the depositions of Gwendolen Alegre, Provident's employee who made the original claims decision denying "own occupation" benefits, and Darragh Ferranti, Provident's appeal consultant who affirmed the original decision.  Pursuant to Provident's request, to which Perryman has not objected, the Court will also permit the administrative record to be supplemented with the depositions of Dr. Pendergrass, Provident's consulting psychologist, and Joseph Randza, Provident's senior disability consultant.

Relevant Insurance Policy Provisions

Perryman's claim for long-term disability benefits is governed by the insurance policy's "any occupation" provision, which became effective as to Perryman on June 1, 1999.

---

chronic fatigue syndrome ....  Recent longitudinal studies suggest that some persons affected by the chronic fatigue syndrome improve with time but that most remain functionally impaired for several years[.]

(www.cdc.gov/cfs/cfsfullcasedefinition.htm)

The policy states in relevant part:

> You are Disabled from Any Occupation if due to Sickness or Injury you:
>
> 1. are unable to earn at least the Any Occupation Income Level shown in Section II- Schedule of Insurance;
> 2. are unable to perform each of the material duties of any occupation for which you are reasonably fitted by education, training, or experience; and
> 3. meet the requirements of the Any Occupation Period in this section.
>
> * * *
>
> The Date of Disability is the date on which your Earnings are less than the ... Any Occupation Income Level.

The "Any Occupation Income Level" is defined as "80% of Indexed Earnings from any occupation you are reasonably fitted by education, training, or experience." The "Indexed Earnings" is defined as the claimant's earnings adjusted by the rate of increase in the Department of Labor's CPI-W (the Consumer Price Index for Urban Wage Earners and Clerical Workers). The "Any Occupation Period" is defined as the period from the end of the Own Occupation Period until age 65 (in Perryman's case).

The policy also provides that "Proof of Loss means written evidence satisfactory to us that you are Disabled and entitled to LTD Monthly Benefits."

Highlights of Medical/Vocational Evidence and Related Procedural Matters in the Supplemented Administrative Record

(1) Jerry M. Fioramonti, M.D.

Dr. Fioramonti, a board-certified family practitioner who stated in October, 1997 that he had treated many CFS patients over the previous five years, was Perryman's primary care physician in Arizona. He treated her from June, 1994 through early 1998, when she moved to Texas. Perryman states that Dr. Fioramonti saw her 16 times.

- 4 -

Perryman first went to Dr. Fioramonti in June, 1994; she then complained in part of "vague, generalized symptoms of excessive fatigue" and was at that time assessed as having a "[p]otpurri of generalized symptoms which remind one certainly of viral infection." (Administrative Record ("AR") at 488). Dr. Fioramonti's medical notes first indicate the "purely speculative" possibility of Perryman being infected with CFS on July 13, 1994, which was when Perryman told him that she had a sister with CFS and wondered if she could also have it. (AR at 487). His assessment of her in February, 1995 was that she had the diagnosis of CFS, "waxing and waning ever since it first hit her back in June." (AR at 486). His assessment of her in May, 1995 was that she had CFS "improved with modification of lifestyle," which was that she went from working 10-12 hour days to working four-six hour days and not working on weekends. (AR at 485). In August, 1995, he noted that her CFS was "really improving in leaps and bounds." (AR at 484). In January, 1997, he assessed her as having a history of CFS with progressive memory loss. (AR at 482).

On April 29, 1997, Dr. Fioramonti's notes state that Perryman had decided that she was going to have to go on total disability and brought in a disability form to be filled that, that he "went through it line and by line with her and filled it out" and that he "fully support[s] her in this diagnosis." He also noted that "[h]er symptoms are the same, which include severe and pervasive fatigue, short term memory loss, mental confusion, myalgias, arthralgias and sleep disorder." (AR at 49 and 481).

On May 15, 1997, Dr. Fioramonti, using a Provident-supplied form, filled out a Mental Health Status Report on Perryman. (AR at 52-53). He stated in that report that her specific symptoms were "frequent bouts of overwhelming fatigue &

total body exhaustion; severe myalgias; short term memory loss and confusion & flu-like symptoms."  He noted on the report that her condition had deteriorated, and that she was not able to perform either her own occupation or any occupation because she "cannot sustain office or supervisory activities due to severe exhaustion, poor memory & confusion."  He stated that the estimated date of her return to work was "unknown & indeterminable."  He commented that "this illness is not specifically treatable or responsive to rehab. Future course is unpredictable."

On May 15, 1997, Dr. Fioramonti also filled out a Provident-supplied Behavioral Capacities form (AR at 51) and a Physical Capacities form (AR at 50). In the Behavioral Capacities form he noted that Perryman "never" had the capacity (1) to perform either simple or complex, repetitive tasks over a period of time according to a set procedure or pace with minimal changes in work activity, (2) to perform frequent changes in tasks and/or skill level without loss of efficiency or composure, (3) to perform duties that are potentially dangerous to self or others and/or make decisions that will affect the well-being of others, and (4) to engage in work where continued employment and earnings are based on amount of goods produced, commission earnings, volume of work processed, and adhering to frequent deadline changes.

Dr. Fioramonti also noted that Perryman had the capacity "up to 1/3 of the work day" (1) to provide direction to others, (2) to influence others in their opinions, attitudes, judgments, (3) to engage in work that involves interpersonal relationships in job situations beyond receiving work instructions, (4) to use sound judgment and make decisions based on subjective/concrete information, and (5) to make generalizations, evaluations, and decisions based on measurable or

verifiable/objective criteria.

In the Physical Capacities form, Dr. Fioramonti noted in part that Perryman could at one time stand and walk for ½ hour, sit for three hours, and drive for one hour, and that during an entire work day she could stand and walk for one hour, sit for four hours, and drive for two hours. He also noted that Perryman could occasionally lift and carry up to five pounds, and could occasionally bend, squat, kneel, and reach.

On October 21, 1997, Dr. Fioramonti filled out another form (AR at 499-500) related to Perryman's ability to do work-related physical activities on which he noted in part that Perryman could, for a total at one time, sit for four hours, stand for one hour, and walk for ½ hour, and could, for a total during an entire eight hour day, sit for four hours, and stand and walk for one hour; he also noted that Perryman occasionally could lift up to ten pounds, carry up to five pounds, and bend, squat, and reach, and that she had a mild restriction in driving automotive equipment. He further commented that Perryman was additionally limited in her activities by fatigue, problems with concentration, and problems on and off with memory, all of which affected her ability to function in a moderately severe manner. He further commented that her fatigue, her memory loss, and her loss in concentration were documented in records but that no objective tests exist to quantify her impairments, and that the lab work findings done at the first presentation of symptoms in 1994 were consistent with CFS.

In October, 1997, Dr. Fioramonti noted that Perryman, for the first time since she had CFS, had developed symptoms suggestive of depression. (AR at 479-80). In December, 1997, he assessed her as having CFS with secondary depression that was possibly starting to respond to Prozac. (AR at 478). In

1   January, 1998, he assessed her as having CFS "with frequent relapses," and
2   secondary depression which was being helped by Prozac. (AR at 475).

3       On August 13, 1998, Dr. Fioramonti filled out an Attending Physician's
4   Statement of Disability form (AR at 210) in which he diagnosed Perryman as
5   having CFS with unimproved progress.  He noted that she was disabled from
6   performing her own occupation and any other work since June 15, 1994, that
7   there were "no meaningful work activities" that she was capable of performing,
8   that her work capacity was "less than sedentary," and that she could not be
9   rehabilitated into her own occupation or any other work.

10      Dr. Fioramonti's notes show that he had various blood work and other
11  clinical testing performed on Perryman during the course of his treatment of her:
12  he obtained a Dim I profile and ESR on June 27, 1994 (AR at 488); blood
13  laboratory work that included thyroid and TSH tests as done on July 8, 1994 (AR
14  at 487); he repeated "Dim 1 and ESR, TSH, EBV and a CMV titer just for
15  completeness' sake" on July 13, 1994 (AR at 487); he ordered tests on "[u]rine for
16  heavy metal screen, Dim 1 profile, ESR, ANA, and VDR" and a brain MRI on
17  January 14, 1997 (AR at 482); a TSH blood test was done on February 27, 1997
18  (AR at 48); and he stated that he would do a "Dim 1 profile to recheck her TSH"
19  on October 17, 1997. (AR at 479).

20  (2)  Clark Hansen, N.D.

21      Dr. Hansen, a naturopathic physician, treated Perryman from July, 1994
22  through March, 1997, which was during the same period of time she was seeing
23  Dr. Fioramonti.  His office notes (AR at 179-91) show treatment or medication-
24  related entries for some 39 different days during that period.  Perryman states
25  that Dr. Hansen saw her 26 times.

26

On March 1, 1995, Dr. Hansen wrote a letter (AR at 25) to an attorney regarding Perryman's medical condition in which he stated in part:

> I have examined Ms. Perryman and diagnosed her as having
> (1) Chronic Fatigue & Immune Dysfunction Syndrome (CFIDS),
> (2) Anemia, and (3) Hashimoto's Thryoiditis [sic]. Ms. Perryman's
> current condition is that of a weakened, easily fatigued, 53 year old
> woman. She is severely limited by CFIDS, the chronic, relapsing,
> persistent illness that renders her incapable of functioning several
> hours per day. Everyone of the above three diagnoses causes
> excessive fatigue, however, CFIDS causes the most profound
> fatigue and limitations.
>
> In addition to severe fatigue, Ms. Perryman suffers from joint pains,
> soreness in the muscles, heaviness in the chest, mental dullness,
> dizziness, and palpitations, all of which are related to CFIDS. She is
> limited to approximately 40-50% of her original capacities.
>
> Ms. Perryman's prognosis is good, but the course of her recovery is
> usually lengthy. The average length of recovery is 5-10 years. I
> have seen significant improvement in her condition since I first began
> seeing her as a patient on 7-20-94. I have recommend [sic] that she
> not work more than 30 hrs per week in order to allow her immune
> system the time to heal.

On October 30, 1997, Dr. Hansen filled out a physical capacities form (AR at 176-77; 501-02) in which he noted in part that Perryman could, for a total at one time, sit for one hour, and stand and walk for ½ hour, and that during an eight hour day she could sit for a total of three hours, stand for two hours, and walk for one hour. He also noted that Perryman could occasionally bend, squat, and reach; he made no findings regarding her ability to lift or carry. He further noted that her pain, fatigue and dizziness additionally limited her activities, and that her pain and fatigue affected her ability to function in a moderately severe manner, and that her pain and fatigue resulted from documented objective or diagnostic findings. He further commented that her "mental fatigue can be severe and very unpredictable. Can black out, illness can be incapacitating for weeks @ a time with short periods of improvement. No known cure."

In June, 1998, Dr. Hansen filled out Medical Assessment Form for CFS supplied by Provident, wherein he stated that Perryman's signs and symptoms were "[f]atigue, malaise, sore throats, low grade fevers, myalgia, arthralgia, mental dullness, sleep disturb [sic], memory loss, exhaustion to point of collapse some days, anterior cervical lymphodenopathy, temp +99.0 F on multiple visits." (AR at 193).  He also noted that Perryman's subjective complaints were "exhaustion that leads to difficulty thinking, concentrating, slow reactions, poor memory," and that her current cognitive functional problems were "exhaustion, memory loss/weakness, confusion, mental dullness, slowness of comprehension.") (AR at 193).

He further noted that the tests he used to rule out other conditions were "Thyroid panel, CBC, SMAC 25, Tender point score for Fibromyalgia, ANA, Anti-DS DNA, Anti SM, Anti RNP, Sjogrens, SSA & SSB, ESR, Thyroid Auto Ab, Thyroid medication, Estrogen Replacement Therapy." (AR at 193).

Dr. Hansen's records show the results of various blood tests taken or done on July 20, 1994 (AR at 159-60), November 15, 1994 (AR at 163), November 21, 1995 (AR at 165), December 9, 1995 (AR at 166-67), December 13, 1996 (AR at 171-72), March 3, 1997 (AR at 21 and 26), and December 9, 1995 (AR at 167-68).

He attached to the CFS form a completed checklist (AR at 192) from the CDC regarding CFS definitional criteria.[3]  He noted that Perryman met both of the

_____

[3]
The CDC criteria listed on the form provided to Dr. Hansen by Provident, which was apparently based on the CDC's 1988 CFS definition, required a patient to have both major criteria plus two or more physical criteria, or eight or more minor criteria in order to meet the case definition for CFS.

major criteria for CFS, i.e. persistent or relapsing fatigue or easy fatigability that does not resolve with bed rest and is severe enough to reduce average daily activity by at least 50%, and exclusion of other chronic clinical problems, including psychiatric conditions.  He also noted that she met nine of the eleven minor criteria, i.e. low-grade fever, sore throat, painful lymph nodes, unexplained generalized muscle weakness, muscle discomfort/myalgia, prolonged general fatigue following levels of exercise that were previously well tolerated, migratory arthralgia without objective signs of arthritis, neuropsychological symptoms, and sleep disturbance.  He further noted that she met all three of the physical criteria, i.e. low-grade fever, nonexudative pharyngitis, and palpable or tender lymph nodes.

(3)  Christine Madsen, N.D.

Dr. Madsen, a naturopathic physician working out of the same clinic as Dr. Hansen, filled out an Attending Physician's Statement of Disability form (AR at 6-7) on May 1, 1997.  Dr. Madsen stated on the form that she had treated Perryman from July 20, 1994 through March 3, 1997.  None of Dr. Madsen's treatment or office notes are in the administrative record.

Dr. Madsen listed Perryman's symptoms as being "[e]xtreme fatigue, short term memory loss, mental confusion, sleep disorder, Fibromyalgia sxs, swollen glands."  Her diagnosis was of chronic fatigue, and she noted that the diagnosis was based on objective findings of "EBV panel, CMV Test".  She noted that Perryman was disabled from both her regular occupation and any occupation

---

The CDC subsequently revised its definition of CFS in part by decreasing the list of symptoms from 11 to 8 and by decreasing the required number of symptoms from 8 to 4.

since February 28, 1997, and that she was not a suitable candidate for a
rehabilitation program.  Dr. Madsen remarked that

> Mrs. Perryman has frequent periods of extreme fatigue - she is
> unable to perform activities of daily living many days.  She also
> suffers short term memory loss which has been affecting her
> performance at work.  She has become somewhat isolated due to
> her status.  She is often bed-bound/house bound.  She cannot do
> her own shopping or meal preparation.

(4)  Hal Breen, M.D.

Dr. Breen, a psychiatrist, examined Perryman on August 28, 1997 at the
request of the Arizona Department of Economic Security as part of Perryman's
application for Social Security disability benefits.  Dr. Breen noted in his report
(AR at 505-13) that Perryman "did not present any clinical evidence of
depression."  His summary of his conclusions stated in part:

> She felt she had a short-term memory loss, slight confusion and
> stated that she had some difficulty with words.  None of these
> situations or symptoms were present on clinical examination today.
> ...
> * * *
> The Mental Status Examination did not substantiate claims of short-
> term memory loss or confusion.  The patient was in good contact
> with reality and her memory for immediate, intermediate and distant
> recall was well within normal limits. ...
> * * *
> The prognosis for this patient is good, if she can obtain effective
> treatment for the condition which is alleged.
> * * *
> The diagnosis of chronic fatigue syndrome cannot be ruled out, as
> this is a somatic diagnosis, by this examiner.  However, the
> allegation of confusion and short-term memory loss is clearly untrue
> in this case.

Dr. Breen also filled out a mental capacities form for work-related activities (AR at
503-04) in which he noted in part that Perryman had a "Fair: seriously limited, but
not precluded" ability to deal with work stresses, a "Good: limited, but
satisfactory" ability to deal with the public, an "Unlimited/very good" ability to

- 12 -

1  follow work rules, relate to co-workers, use judgment, interact with supervisors,

2  function independently, and maintain attention and concentration.  He also noted

3  that she had a "Good; limited but satisfactory" ability to understand, remember

4  and carry out complex job instructions, and an "Unlimited/very good" ability to

5  understand, remember and carry out simple and detailed job instructions.  He

6  also commented on the form that "Patient's fatigue is unexplained by this exam.

7  Not confused; no memory loss."

8         Dr. Fioramonti's Rebuttal - On October 2, 1997, Dr. Fioramonti wrote a

9  letter (AR at 98-99), apparently to someone with the Social Security

10 Administration, responding to Dr. Breen's report; Provident received a copy of the

11 letter on November 11, 1997.  Dr. Fioramonti stated in part in his letter:

> I feel confident that [Dr. Breen's] mental status exam and
> assessment of [Perryman's] though[t] processes and functioning at
> the time of his interview were indeed correct and accurate.
> However, the nature of this patient's disease and the symptoms that
> she suffers from are well known to be an intermittent and fluctuating
> disorder, characterized by periods of remission and then
> exacerbation.
>         The patient has never claimed to have permanent short term
> memory loss, or constant clouding of sensorium.  Quite to the
> contrary, she has always complained of periods of feeling bright,
> energetic, and being able to perform her duties interrupted by
> frequent episodes of symptoms consistent with chronic fatigue
> syndrome, whereby she can barely get out of bed, her sensorium
> becomes very clouded, her short term memory is poor, and her
> general overall level of functioning declines markedly.
>         As a family physician who has treated many patients over the
> last five years with chronic fatigue syndrome, I certainly don't feel
> that the result of this psychological exam taken on one day, when the
> patient was not having an exacerbation of her symptoms, in any way
> should disqualify her from the disability that is well documented in
> the literature, and in our practices suffered by patients who have
> chronic fatigue syndrome.

24 (5)  Thomas Pendergrass, RN, Ph.D

25        Dr. Pendergrass, a psychologist and registered nurse employed by

26

- 13 -

1 Provident, performed a review of Perryman's file on August 4, 1997, and noted
2 that "[f]rom data available there is no clear suggestion of a nervous/mental
3 disorder." (AR at 56).

4       Dr. Pendergrass testified at his deposition that he obtained additional
5 information about Perryman's condition during a telephone conversation with Dr.
6 Fioramonti by telephone on January 13, 1998, and that Dr. Fioramonti told him at
7 that time that he had just seen Perryman that morning, that it was his opinion that
8 Perryman met the criteria for CFS, that there was no evidence of underlying
9 depression and that the depressive symptoms he had noted in Perryman were
10 reactive in nature to the CFS, that he summarized for Dr. Pendergrass the results
11 of the lab results that confirmed his diagnosis of CFS, that he informed Dr.
12 Pendergrass that Perryman was having frequent recurrence of her symptoms that
13 included fatigue, cognitive slowing and psycho-motor retardation, that Perryman
14 would generally have bouts of two week durations followed by a four week
15 improvement, and that there was no foreseeable time that a return-to-work could
16 be predicted. (AR at 46-49).  Dr. Pendergrass also testified that he was not
17 qualified to diagnose CFS (AR at 63), and that there is no objective neuropsych
18 test that can quantify fatigue levels but that fatigue can be observed and
19 evaluated more thoroughly by a FCE. (AR at 54).

20 (6)  Dr. Barton

21       Dr. Barton, a Provident medical advisor of unknown specialty, also
22 performed a file review on August 4, 1997.  Dr. Barton noted that Perryman's
23 diagnosis of chronic fatigue could not be objectively verified, that her condition
24 would not improve with treatment, that her expected recovery date was unknown,
25 and that "[a]t this point, no work [is] feasible." (AR at 58).

26

(7)  Benjamin Harris, M.D.

Dr. Harris, a rheumatologist, performed an independent medical exam ("IME") on Perryman at Provident's request on October 17, 1997.  He noted in his report (AR at 86-88) that "the general physical examination, including neurologic examination, was within normal limits."  He stated that "I thought that Mrs. Perryman, by history and physical examination, had features of both a chronic fatigue syndrome and fibromyalgia."  He noted that Perryman had "extensive testing" done in January, 1997, including an MRI and various blood tests.  He also noted that Perryman had "improved significantly" since the onset of the symptoms in 1994.  As to Perryman's then ability to work, Dr. Harris stated:

> In reviewing the job description as agency manager, I do not think the patient could at present keep up with the demands of such a fast paced position.  It is possible that if there is further improvement in the next year or two that resumption of this work would be a possibility.  At present I do not think the patient is capable of more than sedentary clerical work on a part-time basis.

Dr. Harris also filled out a physical capacities form (AR at 90) on October 20, 1997, in which he noted in part that Perryman could, for a total at one time, stand, walk and drive for ½ hour and sit for two hours, and that in an eight hour day she could stand, walk and drive for a total of one hour and sit for a total of four hours.  He also noted in part that Perryman could lift from the floor, knees, waist, and chest, that she could occasionally lift and carry 25 pounds, and that she could occasionally bend, twist, squat, and kneel, and moderately reach.

(8)  Provident Filed Reports

Provident employee Joseph Mauvais interviewed Perryman on February 12, 1998.  Mauvais' report (AR at 121-26) states in part:

> [Perryman] did appear fatigued and as the interview proceeded, appeared more tired.  She talks in a very soft manner and moves

- 15 -

around slowly.  I observed her walking from the living room up the stairs and back, to retrieve documents in a very slow manner.  At time[s] during the interview, she seemed to lose her train of thought and had to ask where we were. ... At times she broke down and began to cry when discussing her previous occupation, the income she made and her current medical condition. ...

\* \* \*

On the particular day of this interview, she said she was having a good day and was coherent and clear headed.  However, she said she was ready for rest after being with the marriage counselor for approximately 1 and ½ hours prior to the interview.  The claimant says that she has a goal each day of getting up and getting dressed and doing something positive which could include reading, talking to a friend on the telephone or trying to get out of the house. ...

\* \* \*

Current Activities

The claimant is having a difficult time sleeping throughout the night and usually finds herself awakened between 12:00 and 5:00 a.m.  She eventually doses back off to sleep after 5:00 and wakes up whenever she does.  At that time, she tries to take care of her personal hygiene, but if she has no appointments will not curl her hair or do make-up.  She said just doing her hair takes a lot of energy out of her.  On days that she has no personal appointments, just a marriage counselor or doctor, she will stay in the home and usually read and relax by mediation.  She takes her medication and cooks herself a light breakfast usually consisting of toast.  She dresses herself and will go out of her house for appointments, which are usually scheduled in the mid-morning hours.  By 1:00 in the afternoon, she is usually totally exhausted and needs to come home and sleep.  She usually rests from 1:00 to 3:00 p.m.  She is in the house for the rest of the day.  She does no cleaning in the house and does not do her own laundry.  Her daughter does all of the grocery shopping and usually runs errands for her.  Dinner at night for her usually consists of soup.

Restrictions/Limitations

The claimant is restricted at this time from returning to work in any capacity.  Her doctor has recommended some light gentle exercising in include short walks, but she is unable to do so on a consistent basis. ... She suffers from memory loss, and describes her condition sometimes, as a light case of Alzheimer's disease. ... She said in the mornings if she is exhausted, she suffers from anxiety and it is followed by difficulty in decision making, planning, and concentration.  Prior to her illness, she had a personal trainer and worked out on a regular basis.  Since the illness, she has lost all her muscle tone and is not able to work out or walk on a light basis.  She feels that she has lost all strength in her muscles, yet they still ache. ... She has 11 to 14 days of good careful pace and then she will fall back into what she describes as the pit, for 7 to 8 weeks, where she is constantly trying to crawl out and gets sucked back in. ...

<u>Future Plans</u>
... She has a strong desire and will to return back to work, if not in her previous profession then to be rehabilitated in another. She expressed interest in our rehabilitation unit and has expressed a desire to have someone contact her. She desires to be self sufficient and energetic again. ...
* * *
<u>Claim Issues/Concerns</u>
I have no particular concerns at this time. A surveillance may be warranted in this case to verify her outside activities. Her condition appears to be well documented from her attending physician, as well as various tests taken. ... The claimant seems very motivated to wants [sic] to return to [sic] back to work[.]

Provident employee Roy Middleton interviewed Michael Tousley, who was Perryman's supervisor for the last four years she worked, on February 19, 1998. Middleton's filed referral report (AR at 130-31) states in part:

Mr. Tousley stated that the last 4 or 5 months of her employment were sad because he had to continuously cover for her as she could not remember anything that was going on. He gave an example of calling her in the morning to discuss something and then he would call her back in the afternoon and she would have no recollection of the morning call. ... Mr. Tousley talked to Ms. Perryman about reducing her responsibilities and they decided that reduced responsibilities would not help the situation. Mr. Tousley said that in retrospect he thinks Ms. Perryman stayed around a little longer that she should have anyway.

Another Provident employee, Dan Christener, wrote a file memo on June 19, 1998 (AR at 145) in which he states that "[t]here is considerable medical information which supports disability and the continuation of disability benefits at this time." Christener recommended that Perryman be asked to complete a 14-day activity log and that a surveillance be done on her.

(9) Award of Social Security Disability Benefits

A Social Security Administration administrative law judge ("ALJ"), in a decision entered on August 26, 1998, found that Perryman was entitled to Title II disability benefits; he determined that Perryman's disability onset date was

February 28, 1997.  The ALJ concluded that Perryman's combined impairments of chronic fatigue syndrome and depression prevented her from "engaging in work activity on a regular and consistent basis" (AR at 496), and that Perryman did not have "transferable skills to perform other work within her physical and mental residual functional capacity." (AR at 495).  The ALJ also stated that "[g]iven the claimant's residual functional capacity, and the vocational factors of her age, education and past relevant work experience, there are no jobs existing in significant numbers the claimant is capable of performing." (AR at 496).

Provident was aware of the Social Security disability award by October of 1998, which was prior to its initial rejection of Perryman's claim for "any occupation" disability benefits, in that it reduced the amount of Perryman's "own occupation" benefits by the amount of her Social Security disability benefits. (AR at 250).

(10)  Clark Craig, M.D.

After Perryman moved to Texas in 1998, she first saw Dr. Craig, speciality unknown, for a short period of time.  His office note from his examination of her on April 6, 1998, which included a TSH blood test that came back within normal limits, assesses her as having "chronic fatigue syndrome with features of fibromyalgia." (AR at 491).  On a follow-up visit on July 31, 1998, Dr. Craig again assessed Perryman as having chronic fatigue syndrome. (AR at 489).

(11)  Surveillance Report

Provident hired International Claims Specialists to conduct a surveillance of Perryman in Texas.  A three-day surveillance was conducted in July, 1998.  The summary section of the surveillance report (AR at 236-37) states that:

> On Sunday, 7/26/98, the claimant and an elderly female companion departed in a black Mercedes with Arizona plates at 9:09 a.m. and

drove to church in Marble Falls, Texas.  On the way they stopped for gas.  After church they stopped at a residence in Tendron, Texas for a few minutes before returning home.  In the early afternoon, they departed the house again and drove to the same residential house.  After about a two hour visit, they drove back home.  No other vehicles or any other people were observed at the claimant's address.

On Monday, 7/27/98, the claimant and the elderly female were observed at home at various times of the day for brief periods.  The first observation was at 7:56 a.m. and the last observation of the claimant was at 8:02 p.m.  The claimant did not go anywhere in her vehicle.  No other vehicle or any other people were observed at the claimant's address.

On Tuesday, 7/28/98, the claimant was observed at 7:50 a.m. and at 1:25 p.m. very briefly at home.  She did not go anywhere in her vehicle.  No other vehicles or any other people were observed except for the elderly lady.

* * *

Videotape documentation shows the claimant walking, driving, putting gas in her vehicle, carrying a potted plant and bending at the waist to pick up an unknown object.

(12)  Sidney Shinkawa, M.D.

Dr. Shinkawa, an internist, became Perryman's primary care physician in July, 1998.  Perryman states that Dr. Shinkawa saw her eight times.

Dr. Shinkawa filled out an Attending Physician's Statement of Disability form (AR at 277) on March 2, 1999, in which she noted that Perryman's subjective symptoms were "fatigue-unable to stay awake [and] decreased concentration."  She diagnosed Perryman as having chronic fatigue, and noted that Perryman was disabled from March 1, 1997 from performing her own occupation and any other work and that it was unknown when she could return to work.  She also noted that "Pt is unable to stay awake all day."

Dr. Shinkawa wrote a letter (No Bates number; in AR vol. 3, Tab B) to Gwendolen Alegre, Provident's claim representative, on August 20, 1999, in which she stated in part:

... Nancy Perryman has carried the diagnosis of chronic fatigue syndrome since 1994 according to our records under Dr. Fioramonti. She appears to be basically unchanged since the diagnosis was made. Her symptoms are (1) Unexplained severe fatigue. (2) Post-exertional malaise - out of proportion to physical activity. (3) Unrefreshing sleep - also worked up in sleep clinic in Temple. (4) Muscle aches and pains (fibromyalgia symptoms) also well documented by Dr. Chune (endocrinologist) and Dr. Wilkinson (neurologist) as well as Dr. Fioramonti. (5) Multiple joint pains (6) Tension headaches (7) occasional sore throat in AM when she is very fatigue[d]. (8) Impaired memory and concentration when her fatigue is severe. Nancy's major complaint - overwhelming fatigue has rendered her unable to hold down an office job as documented by Dr. Fioramonti.

She has had a battery of test[s] done - (which were normal) to exclude other diseases which could mimic CFS. She has also been evaluated by numerous specialists [:] Dr. Terry Wilkinson (neurologist), Dr. Ga[r]y Chune (endocrinologist), and a sleep clinic specialist, who have concurred with the diagnosis of CFS. She has also had a normal MRI of the brain.

Nancy also developed severe orthostatic hypotension (probable autonomic neurally medicated hypotension) which responded to fludrocortisone and is related to CFS.

Nancy Perryman has also related to us - that under the suggestion of Provident she was evaluated by a psychiatrist for possible depression, and it has been my opinion as well as Dr. Fioramonti that depression was not a major diagnosis, but secondary to CFS.

Dr. Shinkawa also provided an affidavit (AR at 527) on October 21, 1999, wherein she stated in part:

3. Based on Ms. Perryman's history as well as my examination of her, I have concluded that she suffers from chronic fatigue syndrome.
4. In 1998, I treated Ms. Perryman for complaints of orthostatic hypotension. Orthostatic hypotension is a sudden drop in blood pressure related to changes in body position. This condition cannot be faked by a patient. Orthostatic hypotension is often associated with chronic fatigue syndrome.
5. At the current time, Ms. Perryman is unable to work any job for 40 hours a week due to her chronic fatigue. Additionally, she is unable to drive the 45 minutes drive from her home to town on a daily basis because of her problem with concentration caused by her fatigue.

Dr. Shinkawa's notes state on July 15, 1998 that Perryman recently had

1 her "thyroid level and laboratory done" (AR at 370), that she had a holter heart
2 test performed on Perryman on October 5, 1998 (AR at 311), and a EEG done on
3 October 12, 1998. (AR at 312).

4 (13)  Gary Chune, M.D.

5    Dr. Chune, an endocrinologist, treated Perryman for several months in the
6 last half of 1998 for her syncopal episodes (dizziness and blackouts) based on a
7 referral from Dr. Shinkawa.  After examining Perryman and having various blood
8 tests done, Dr. Chune concluded on October 12, 1998 that Perryman did not
9 appear to have any problems with her adrenal glands, but that she did have
10 orthostatic hypotension. (AR at 329-30).  Dr. Chune noted on November 24, 1998
11 that Perryman had "what appeared to be a possible chronic fatigue syndrome,"
12 that she had mild hypercalcemia, that she did not appear to have any known
13 endocrine disorder, and he ruled entities such as hyperparathyroidism. (AR at
14 327).  Dr. Chune's assessment of Perryman on December 8, 1998 was that she
15 had orthostatic hypotension, that he could not find any other abnormalities, that
16 he was left with a possible diagnosis of pure autonomic failure/possible
17 sympathetic failure, and that she did not appear to have any Parkinsonian type
18 symptoms suggestive of Shy-Drager syndrome. (AR at 326).

19    Dr. Chune's notes show that he performed a rapid cortrosyn simulation test
20 and adrenal and calcium blood workups, including SMA-12, ACTH, TSH, T4,
21 T3U, and CBC on October 12, 1998. (AR at 326, 329-30).  They also show that
22 he evaluated Perryman for "any potential endocrine disorder" by doing laboratory
23 blood tests for ACTH and morning serum cortisol, thyroid function and TSH, and
24 SMA-12 on November 24, 1998. (AR at 314).

25

26

(14)  GENEX Report

Provident referred Perryman's claim to GENEX Services, Inc. in March, 1999 for the purpose of addressing CFS treatment issues with Dr. Shinkawa.[4]  A GENEX representative, Judy Minter, interviewed Dr. Shinkawa on March 23, 1999.  Minter's report (AR at 334-37) states in part:

> Dr. Shinkawa reported that at her appointments, Ms. Perryman is complaining of headaches, problems sleeping, and waking up every few hours through the night.
> * * *
> When asked to list the [CFS] criteria identified in formulating her diagnosis of Ms. Perryman's [CFS], Dr. Shinkawa reported that she had not diagnosed Ms. Shinkawa as having [CFS]. That Ms. Perryman had only reported to her that she had that condition.
>
> As I went over the list of the CDC criteria provided to me by Provident, Dr. Shinkawa stated that Ms. Perryman has no low grade fevers.  She has complained of a sore throat (a funny feeling). But there has been no redness, no puss [sic].  There has been no evidence of painful cervical or lymph nodes.  Ms. Perryman does complain of muscle weakness and there is a lack of muscle tone but Dr. Shinkawa reports that this muscle tone has not been documented.  Dr. Shinkawa also reports Ms. Perryman does complain of achiness, sleep disturbances, extreme forgetfulness and loss of short term memory.
>
> Dr. Shinkawa noted that she felt that Ms. Perryman's worse problem was her severe orthostatic hypotension which has caused her to faint when she stood up quickly.  Dr. Shinkawa has prescribed Florinet [sic-Florinef] for this problem and the problem has resolved itself.
> * * *
> When Dr. Shinkawa was asked to please site [sic] findings that support Ms. Perryman's functional loss, she reported that Ms. Perryman has muscle atrophy but she also stated that she has not measured this.
> * * *
> Dr. Shinkawa reports that since Ms. Perryman cannot perform any type of duties for more than 2-3 hours without extreme fatigue and since her muscles have atrophied that she is not able to perform any type of work.  She states her memory would also be a problem in her

---

[4]

GENEX is a managed care service provider which was purchased in 1997 by Provident Companies, Inc., now UnumProvident.

returning to work.  Dr. Shinkawa notes that she has not tested this - it is simply by claimant's report.  Ms. Perryman has never forgotten a scheduled appointment.  To address the issues of extreme fatigue and muscle atrophy, Dr. Shinkawa has referred Ms. Perryman for an FCE.

* * *

Barriers to Return to Work
1. A general practitioner physician who is not currently addressing Ms. Perryman's [CFS].
2. Ms. Perryman's apparent total lack of or desire for meaningful activities.

(15)  HealthSouth's Functional Capacity Evaluation

A functional capacity evaluation ("FCE")  was performed on Perryman by HealthSouth Industrial Rehabilitation Center on April 12, 1999 (No Bates numbering on legible copy; is in AR vol.3, tab C).  The examiner concluded that the FCE showed that Perryman was functioning in the Department of Labor's sedentary work classification.

The FCE states in part that "Ms. Perryman noted to be laboring by the end of testing to complete activities. She completed test over the course of 4 hours." It also states that Perryman "was unable to complete the frequent lift test in time frame adequate to determine a frequent level," and that the examiner "[n]oted problems with blood pressure during [positional tolerance] testing showed rapid changes up and down."  It also comments that positional tolerance "[a]ctivities were evaluated in a sustained circuit for a total tolerance of 20 minutes prior to needing a rest break.  This was taken into consideration when establishing work level for consistency."  It further comments that "[h]er aerobic capacity was assessed as average for age and sex. She was able to walk a sustained pace of 2 mph for 12 minutes and covered a distance of .35 miles."

The FCE examiner also filled out a physical capacities form on Perryman.[5] (Exhibit/AR at 410A).  The examiner stated in part that Perryman can stand, walk, sit and drive for only ½ hour at a time, and that during an entire workday she can stand, walk, and drive for a total of two hours and can sit for a total of four hours. He also stated in part that Perryman can lift from the floor to over her head, that she can occasionally lift and carry up to 20 pounds, that she can occasionally bend, twist, squat, and kneel, and can moderately reach.

Perryman's Response to the FCE - Perryman submitted an affidavit dated October 24, 1999 (AR at 35-36) in which she stated in part: "At Provident's request, I went to be evaluated at Healthsouth.  I was only able to spend 13 minutes on the treadmill and then needed a 45 minute nap before I could continue any other exercises.  Even though I did less than one hour of exercises while I was at Healthsouth, I was so exhausted that I spent the next four days in bed."

(16)  J. Terry Wilkinson, M.D.

Dr. Wilkinson, a neurologist, examined Perryman on June 16, 1999 on a referral from Dr. Shinkawa.  In his report (AR at 518-21), Dr. Wilkinson stated in part that Perryman informed him that "[s]he has felt constantly tired since [1994], although the degree of fatigue and feeling tired tends to wax and wane"; that her placement on Florinef in October 1998 "has pretty much controlled the orthostatic lightheaded-type sympomatology and she has not had any further episodes of syncope"; that her "depressive symptoms resolved on Prozac and she also feels

---

[5]

The form is unsigned and undated but neither party disputes that the FCE examiner completed it at the time of the FCE.

that her fatigue symptomatology improved on the Prozac"; that she "has had problems with her 'memory and thinking being cloudy' whenever she is extremely fatigued, but only when she is very tired"; and that she denied "any progressive decline in memory or cognitive functioning."

In the "Impressions" section of his report, Dr. Wilkinson stated in part that he could not find any "evidence of a primary neurological disorder" causing either the CFS problem or the orthostatic hypotension, and, in regard to Perryman's complaints of difficulty with memory, cognitive functioning, and concentration when she is fatigued, that he did not "feel that this represents a true organic problem with memory or cognitive functioning. Her cognitive functioning and memory are normal on examination. This is an inefficiency of thinking and concentration when she is tired." Dr. Wilkinson also stated that Perryman "has actually symptomatically improved rather significantly with the combination of Prozac and Florinef."

(17) E.C. Curtis, M.D.

Dr. Curtis, a specialist in occupational medicine, was Provident's main in-house medical consultant on Perryman's claim. Dr. Curtis submitted two reports in this case based solely on his review of Perryman's claim file.

In his first report (AR at 417-19) dated May 12, 1999, Dr. Curtis stated in part:

> This patient sees herself as completely unable to function occupationally. Although she claims that she must sleep 12-14 hours a day, she appears to be quite capable of performing basic ADL's [activities of daily living] at this time. While she does meet the few loose, vague criteria for CFS, she appears to have been so labeled based almost entirely on her self reports. Unfortunately there are no truly objective findings to establish presence or absence of this disorder. The fact that she reportedly has such findings as low grade fevers, intermittent occurrence of small nodes, and has had non-febrile exudative pharyngitis, etc. is not convincing. None of

- 25 -

these, nor the combination of them, is pathognomic for CFS.

Her complaints of incapacitating fatigue seem to be exaggerated in light of the FCE findings ..., albeit she and her AP [attending physician] will no doubt say that those findings represent what she could do on one of her "good days" and that she was "wiped out" for hours or days thereafter.
* * *
In addition, she says that she has problems with concentration and with short term memory. Nothing further in the chart substantiates that these are significant problems for her. ... Besides this, Ms. Perryman claims that she has fainting spells. These are not independently verified, and there seem to be no objective findings in the record consistent with what her AP called orthostatic hypotension.

The few physical findings which are recorded in the chart, are generally unremarkable. The same is true of most of the lab results, there being no definitive findings in support of her alleged disability. Indeed a variety of laboratory tests have been done, and while there is some indication of hypothyroidism, even this is not extreme and should be readily responsive to medication.

It should be noted that many of her complaints are consistent with explanations other than by attribution to [CFS]. For instance, fatigue is often a manifestation of depressed mood. It can also be a result of hypothyroidism.

Likewise, complaints about sleep are often related to depressed mood. They are not infrequently a function of poor sleep hygiene as well. ...

The reported problems with concentration and short term memory are also consistent with depressed mood. In her case they may well be a function of distraction secondary to her apparent rather severe problems related to issues involving marriage and divorce.
* * *
A recent FCE indicates that Ms. Perryman is capable of sedentary work despite suggestions of deconditioning effects. These effects could account for some of the seeming weakness in her lower extremities and also might very well explain variability in blood pressure readings.
* * *
However, a careful review of the records at hand seems to support the view that two other underlying factors are at work here and are at least in part probably causal. These two, particularly in combination, could go a long way toward explaining most of her symptoms. Neither appears to have been adequately addressed thus far.

One is depressed mood/probable reactive depression, indicators of

- 26 -

which have been noted above. ...

The other is a set of closely interwoven psychosocial issues, including: a perception of near exhaustion from reported long hours and stressful aspects of her previous job (apparently seen as "too much" for someone in her mid-50's who might understandably be tired of the struggle). Also there is the perception of feeling overwhelmed by the process of marital separation and divorce[.] ... Besides this, there is apparently growing perception on her part of in-validity, that is to say, development of a disabled mind set.

All of these factors are present in the context of caregivers who seem less than inclined to encourage and facilitate abilities and instead support disability, and of a claimant who reportedly has limited economic incentive to resume work.

Recent FCE findings give the impression that the claimant is capable of doing considerably more than her self reports might indicate. That is to say, she is capable of not only performing basic ADL's, but also seems very likely able to perform sedentary work. In view of her protracted relative inactivity and of consequent deconditioning effects, she would probably need to start off working part time for some weeks. Then she could gradually progress toward working 8 hour days.

Although it seems that the individual may not really wish to return to work, and that she has many (albeit poorly substantiated) complaints, the few objective indicators available in the record seem not to support her contention that she is totally incapable of occupational involvement. There does appear to be a need for more serious attention being given to her mood disorder and to assuring that she has adequate psychological and social support in the midst of her marital struggles. While she may indeed believe that she is incapable, that assessment seems to be an exaggeration. Ms. Perryman would very likely benefit significantly from the socialization and disciplines involved in at least a gradual return to the work place.

Provident used Dr. Curtis' report as a primary basis for discontinuing Perryman's disability benefits. After Perryman filed her administrative appeal, which was supported by a letter from her attorney raising issues concerning the validity of Dr. Curtis' report, Provident had Dr. Curtis reexamine the file. Dr. Curtis issued a second report (AR at 547-51) on November 24, 1999. Dr. Curtis' post-appeal report states in part:

A careful reexamination of Dr. Fioramonti's clinical notes since 1994 fails to uncover any <u>systematic</u> listing of items accepted as criteria for chronic fatigue syndrome. ... However, at different times the record does record complaints of low grade fevers and sore throat, plus reputed muscle and joint pain, plus alleged concentration/memory problems, which in company with then new complaints about the onset of unexplained, persistent, chronic fatigue not due to ongoing exertion or alleviated by rest, and which substantially reduces operational et al activities, are documented.

Relative to ability to perform ADL's and alleged problems with concentration/short term memory, Ms. Perryman's attorney refers to a number of statements by Dr. Hansen et al. in supposed support of the view that Ms. Perryman is impaired in these areas. For the most part, these individuals seem to be voicing essentially recitations or paraphrases of what Ms. Perryman has told them about her functioning. These seem not to be of observations which they themselves have made.

(The same type of thing is reflected in most of the testimonials which were written on her behalf by family, friends, et al.[)] ...
* * *
Relative to alleged problems with concentration and short term memory, my report does indeed conclude that these are not substantiated by information in the records. As of this date, they still have not been thoroughly substantiated. This is despite statements by Doctors Hansen and Fioramonti who generally seem to be reciting what the patient has told them about such, rather than supplying what are clearly their own objective observations or assessments based on testing.

Not only has no neuropsych testing been done, it appears that these physicians have not even used simple measures which are quite amenable to office administration. In fact, it seems that only two physicians have utilized even such basic measures and have reported on them. On of these is Dr. Breen who went on to conclude that "the allegation of confusion and short term memory loss, is clearly untrue in this case."

In addition, neurologist Wilkinson, having conducted such testing, reports that Ms. Perryman's cognitive function and memory are normal on examination. He expressed his belief that the alleged difficulties do not represent a true organic problem, but instead "an inefficiency of thinking and concentration when she is tired".
* * *
Relative to the number of doctors who have supposedly confirmed the diagnosis of CFS, it is well known that once labels have been applied, subsequent examiners frequently simply list them as part of the problem list (sometimes adding "by history" or "by report) <u>as if</u> they were confirmed.

That does not <u>necessarily</u> mean concurrence, but that due to time constraints and other considerations they seldom controvert such labels unless there is some unusual circumstance or finding.

However, my report acknowledges up front that she does meet the few loose, vague criteria for CFS. At the same time, that report legitimately queries whether, in view of the fact that many who are so labeled either remain functional, or improve and become more functional, this individual is truly significantly dysfunctional. Also, there is a seeming contradiction between asserted and demonstrated ability, e.g., based on FCE findings that seem to show residual functional capacity well beyond what this claimant claims to be able to do.

\* \* \*

Regarding "estimates of ability to do work related activities", completed by Dr. Fioromonti [sic], these two documents (done about one week apart) exhibit some inconsistencies with one another. In addition, they appear to be based on assessments absent any actual testing. Despite that, they can be interpreted as suggesting that part-time work is a possibility for this individual.

\* \* \*

[CFS] has essentially no objective clinical findings, but individuals so labeled are still subject to assessment in terms of functional parameters. In this case, the scant objective evidence available relative to functional impairment suggests that, even if this label is accurately applied, Ms. Perryman has enough residual functional capacity to allow for sedentary to light tasks much of the time.

Thus, given a reasonably accommodating work setting, with even a modicum of worker determination to embrace validity (vs in-validity), successful return to work can be accomplished. While return to work after a worker has been out for over five years is statistically exceedingly rare, there appears to be no objective functional basis to justify this particular individual's continuing absence from the workplace.

(Emphases in original).

(18) Nancy Perryman

Perryman completed a 14-day daily activity log (AR at 196-209) in July, 1998, wherein she noted her functional ability to perform only limited daily tasks.[6]

---

[6]

The log sheets asked the following questions: hour of rising, any sleep disturbances prior night, breakfast prepared by, breakfast consisted of, [morning] activities, lunch prepared by, lunch consisted of, [afternoon] activities, dinner

Perryman submitted an affidavit (AR at 535-36) dated October 24, 1999, wherein she states in part:

> 1. Since 1994, I have been suffering from [CFS]. After I first became sick, I tried to continue working part-time, but this caused my symptoms to get worse. I have been unable to work since March 1, 1997.
> 2. In 1998, I moved to a small town in Texas to try to rest and recover from my illness.
> 3. Since I have been sick, if I try to do too much, I get extremely exhausted to the point I spend an entire day or more resting or sleeping. In the last six months, there have been many occasions where I have been unable to do anything all day because of exhaustion. For example, one time I decided to walk the four blocks to town and back in order to build up my strength. As a result of walking that far, the next day I was in bed all day. On another occasion, I tried to do some leg exercises in order to strengthen my legs. I bent my knees and contracted my thigh and butt muscles three times. As a result of this activity, I was in bed for two days. Just recently, while I was visiting one of my daughters in Arizona, I flew to Las Vegas to spend the weekend with my daughter and son-in-law. On Friday, I took the plane flight to Las Vegas and then went out to dinner with my daughter and her husband. As a result, I was so exhausted that I spent Saturday, Sunday and Monday in bed.
> 4. Since I have been sick, I have had problems with my memory and concentration. For example, sometimes when I'm in my car, I can't remember where I am going. One time, I pulled up to a stop sign and knew I was supposed to stop. However, I forgot that I needed to remain stopped until the traffic had cleared and almost got into an accident.
> 5. Before I got sick, I used to drive approximately 30,000 miles per year. Now, just driving 20 minutes to see my doctor and then driving home is all I can do in one day. Many days I am too exhausted even to drive the four blocks to town in order to pick up my mail.
> * * *
> 7. I am not currently able to work 40 hours a week. I cannot even work two hours a day.

(19)  Evidence From Friends and Co-Workers

Lucinda Jensen, who was Perryman's administrative assistant for approximately two years starting in the spring of 1994, provided an affidavit (AR

_____

prepared by, dinner consisted of, [evening] activities, hour of retiring, misc. notes.

- 30 -

at 529), dated October 25, 1999, in which she stated in part:

> 2. During the time that I was working for Nancy, she was already sick. During that time, she had problems with a lack of energy as well as problems with her memory.
> 3. As Nancy became more ill, she moved her office into her home. There were some days when she was too ill to even get out of bed. This was very much unlike her. There were some days that she was so sick that it took her all morning just to fix her hair and get her makeup on.
> 4. During the time I worked for Nancy Perryman, there were days when she was too fatigued to work.

Bobbi Moore, a Texas friend of Perryman who saw her nearly very day between March and December of 1998, provided an affidavit (AR at 533), dated October 15, 1999, in which she stated in part:

> 2. In 1998, Nancy had good days and bad days. When Nancy was having a good day, we would go for a walk in the morning. We would generally walk between one half and one miles [sic].
> 3. When Nancy was having a bad day, she could hardly walk. On bad days, Nancy would spend a great deal of time in bed.
> 4. When Nancy first moved to Texas, she was having bad days nearly all of the time. Later in 1998, she was having bad days only about one half of the time.

Carl Osterman, Perryman's certified public accountant for eight or nine years, provided an affidavit (AR at 530), dated October 14, 1999, in which he stated in part:

> 2. Since Nancy became sick, she has had problems with her concentration. There are times when she will be conversing normally and then loses her concentration. During these times, she has a spaced-out look and is unable to follow our conversation.
> 3. Nancy's problems with concentration are completely unlike how she was before she got sick.
> 4. Nancy was still having problems with concentration during the last two years.

Janis Ware, a Texas clinical aesthetician, who provided some eighteen muscle toning treatments to Perryman, three times a week for approximately six

weeks, provided an affidavit (AR at 532), dated October 22, 1999, in which she stated in part:

> 4. Approximately 25% of the time I have seen Ms. Perryman, she appeared totally exhausted. Additionally, she canceled two appointments because she was too exhausted to drive to the therapy session. Ms. Perryman falls asleep during nearly all of her therapy sessions as a result of exhaustion from the thirty minutes drive from her home.

(20) Pam Perdue

Pam Perdue, an in-house vocational rehabilitation consultant for Provident, sent two transferable skills analysis ("TSA") reports to Provident regarding jobs Perryman could perform; nothing in her reports states what records she reviewed before making her recommendations.

In her first report (AR at 422), dated May 26, 1999, Perdue stated in part:

> Claimant appears to have the capacity to perform a sedentary job. Based on her vocational training and experience, the following jobs would appear feasible. The wages attached to the following jobs are a beginning point. Most of these positions also include commission pay which can make the earning capacity unlimited depending on the motivation and skill of the person performing the job.
>
> Special Agent 166.167-046 $615/week
> Risk and Insurance Manager 186.117-066 $672.00/week
> Insurance Office Manager 186.167-034 $536.00/week
> Closer 186.167-074 $559.00/week
> Brokerage Office Manager 186.117-034 Salary varies and may
>                                      include commission.
>
> All inhouse sales type work could also be appropriate as long as the job is sedentary. These jobs are mainly paid by commission.

In her second report (AR at 555), dated December 28, 1999, Perdue stated that she conducted a three stage investigation in order to produce information for executive/management type positions that would allow Perryman to use her insurance, sales, and management experience and travel minimally. First, she

contacted a headhunter in the insurance industry who gave "salary ranges of $65-$90 thousand for claims type management and $85-$105 thousand for marketing management. However, his [sic] did not include bonus material." Second, she spoke with a UNUM/Provident sales recruiter and "discussed executive type occupations such as VP National Accounts, VP Marketing, and VP Market Management in a home office type environment. Base salary would be $90-$150 Thousand with a bonus potential of 20-25%." Third, she conducted "Internet research regarding the national economy wage data" concerning jobs which would allow Perryman to use her expertise in insurance, sales and management. The information she collected, which was from the Wall Street Journal, based on a PricewaterhouseCoopers report, included:

> Top marketing and sales-Median Salary $183,500 + Median Bonus $65,350 = $248,850.
> Top administration-Median Salary $156,917 + Median Bonus $64,574 = $221,491.
> Top claims-Median Salary $150,000 + Media Bonus $50,000 = $200,500.
> Top underwriting-Median Salary $115,000 + Median Bonus $22,500= $137,500.

Perdue noted that the executive positions correlated directly with the occupations identified in her previous TSA.

(21)  Provident's Denial Letters

Provident initially denied Perryman's "any occupation" disability claim in a letter dated May 27, 1999.  That letter (AR at 426-28), written by claims examiner Gwendolen Alegre, stated in part:

> We have completed a thorough review of your LTD claim file. Included in this review were medical records from Drs. Fioramonti, Hansen, Madsen, Harris, Shinkawa, and from [FCE] physical therapist Manuel Vielma.  In this review, we noted that laboratory test results were within normal limits except for indication of some possible hypothyroidism.  Your reported complaints of fatigue, short-

term memory loss, and sleeplessness are subjective and indicative of depressed mood rather than Chronic Fatigue Syndrome.

Medical records indicate that your orthostatic hypotension has been controlled with appropriate medication. The functional capacity evaluation indicates that you at least [are] capable of sedentary work and possibly more after exercise and work hardening offsets your deconditioning due to inactivity. There is no documentation that you meet the Center for Disease Control criteria for CFS, and no objective documentation which indicates you experience any ongoing symptomolgy which would render you disabled from all types of employment.

We are concerned with your return to gainful employment. What follows is a list of some of the types of jobs you may be able to perform:

      1. Insurance Office Manager
      2. In-House Sales Consultant
      3. Brokerage Office Manager (title of previous position with
                                 Western Farm Bureau)
      4. Agent for Insurance Sales

Many of these positions include commission and bonus incentives which make the earning potential unlimited. Please note that this list is not intended to be comprehensive, but is only a partial list of examples of some of the types of jobs you may be able to perform.

As a result of Perryman's administrative appeal, her file was reviewed by Darragh Ferranti, a Provident appeals consultant. In December, 1999, Ferranti submitted an Appeal Recommendation (attached to Perryman's trial brief[7]) to various Provident personnel that recommended that Provident resume paying benefits to Perryman. Ferranti's report stated in part:

With regard to questioning the diagnosis of chronic fatigue, Dr. Curtis did a thorough and detailed review of the complete medical records. However, we have paid this claim since 1997 without contesting the diagnosis of CFS, in fact, our own IME in 1997 supports the diagnosis. The insured's condition has not been reported to have

---

[7]    In January, 2003, the Court ordered this document to be produced to Perryman notwithstanding that it was an attorney-client privileged document, and stated that it would be considered part of the administrative record.

- 34 -

improved significantly since 1997. There likely is support for our conclusion that the insured may now have sedentary work capacity and a TSA concluded that there were occupations that the insured could perform, such as special agent, risk and insurance manager, insurance office manager, closer, and brokerage office manager. Please note that the starting pay for the highest paid of these positions is $615/week or app. $32,000.00 per year. According to the contract, under the any occ provision the insured will be considered to be disabled if she is unable to earn at least 80% of indexed earnings. While these positions offer a possibility of commission income, the 80% level is based on the insured's prior earnings would be $160,000.00.

I spoke with Dan Christner [a Provident employee] about this file and left it to him to review. We agree that the insured's high level of pre-disability income makes it difficult to support that she could earn the contractual requirement with sedentary work capacity, given that the majority of the income is commission based and depends upon the motivation and energy of the individual.

I do not feel we have a strong basis for denial of this claim given the two issues outlined above, at least at this time.

Notwithstanding her earlier recommendation, Ferranti wrote a letter (AR at 556-58) on December 29, 1999 to Perryman's attorney wherein she denied Perryman's appeal. Ferranti stated at her deposition that she changed her position on the appeal after obtaining a clarification from HealthSouth that the FCE results pertained to an eight hour work day, and based on the results of Pam Perdue's second TSA. (Ferranti's deposition at 28-29 and 52-53).

Provident's final denial letter, written by Ferranti, stated in part:

Based upon the medical review, it appeared to us that the diagnosis of [CFS] had been based upon Ms. Perryman's self-report to her attending physicians. We felt there may be a question regarding the accuracy of this diagnosis, or there may be other conditions to consider which could be causing her symptoms of fatigue, memory loss and sleep dysfunction, such as depression, a sleep disorder or hypothyroidism. As Ms. Perryman experienced improvement of symptoms with the use of psychotropic medications, it would appear there is support for depression as an underlying condition. It also appears from your letter and the records that Ms. Perryman suffers from a sleep disorder - she relates this as insomnia and states that she was told by the sleep clinic that they could do nothing for it. No

- 35 -

records from this evaluation have been supplied, however, in order for CFS to be diagnosed, a sleep disorder must be excluded as the cause of the fatigue. Sleep dysfunction can also occur as a result of Ms. Perryman's daytime naps which would interfere with nighttime sleep patterns.

Ms. Perryman's allegations of problems with memory loss and concentration have not been substantiated. Reports by Doctors Hansen and Fairmont [sic - Fioramonti] appear to be reciting what Ms. Perryman has related to them rather than providing their own objective observations or assessments based on testing. Dr. Breen, who did an evaluation of Ms. Perryman, concluded "the allegations of confusion and short-term memory loss, is clearly untrue in this case."

Dr. Wilkinson also reported that Ms. Perryman's cognitive function and memory are normal on examination. He related that the difficulties Ms. Perryman alleges could be the result of "insufficiency of thinking and concentration when she is tired."

It also appears that Ms. Perryman had a source of great stress prior to stopping work. The July 1994 records of Dr. Hansen mention extreme stress times 3 years with regard to her divorce and the same complaints (including memory loss, loss of concentration, dizziness, blackouts, arthralgias, sleep problems, anxiety) that she claims disabled her in 1997. During the course of her claim she apparently continued to be involved with the divorce from her husband, it appeared to be ongoing in 1998 and may reasonably have affected her function, including concentration and overall feeling of wellbeing. We also note that Ms. Perryman told Dr. Breen in August of 1997 that her marriage was "very good." This appears to contradict her statements made to Dr. Hansen in 1994 and also her subsequent divorce proceedings which appear to have begun in late 1997 or early 1998.

Dr. Fiormonti [sic] in his records dated April 29, 1997 indicated that Ms. Perryman found her work to be stressful as well.

There are a number of discrepancies in the medical records regarding treatment. For example, Ms. Perryman's last day worked was February 28, 1997 per her claim form, however, there are no treatment records from January 1997 to April 1997 when Ms. Perryman filed her claim. We also note that Ms. Perryman stated to Dr. Breen that she was totally bedridden for 110 days when first affected by CFS, however we find no records that support this.

Our determination of disability is not based upon the diagnosis of a condition. In other words, whether Ms. Perryman is diagnosed with chronic fatigue, depression or some other condition, the degree of disability is based on restrictions and limitations from a mental and/or physical standpoint.

As a result of the FCE, it appeared reasonable that Ms. Perryman, with a short period of work hardening to increase stamina caused by lack of use, could perform the duties of a sedentary occupation for an 8 hour workday. Therefore, benefits were paid to May 31, 1999.

We completed a wage review for executive/management type positions which would allow Ms. Perryman to use her insurance, sales and management experience and to travel minimally.

Included in these findings were positions such as VP National Accounts, VP Marketing, VP Market Management in a home office type environment. Base Salary range would be $90,000-$150,000 with bonus potential of 20-25% of salary. Additional opportunities gathered from "Compensation in the Financial Services Industry, 1999", PricewaterhouseCoopers, Global HR Solutions Survey Unit, Westport, Conn. Include: Top marketing and Sales - Median Salary $183,500 plus median bonus, $65,350; Top Administration - Median Salary $156,917 plus median bonus $64,574; Top Claims - Median salary $150,000 plus median bonus $50,500.

You included with your appeal testimonials from relatives, friends and associates of Ms. Perryman. Of note, based upon this information which includes reports by these persons of Ms. Perryman's complaints of fatigue, it is clear that Ms. Perryman continues to drive despite her self report of concentration and memory problems which would place her and others on the road at risk. We have observed her activities out and about in public, including driving with 95 year old mother in the car with her. It also appears that Ms. Perryman is able to care not only for herself but also for her essentially blind mother, dressing, feeding her etc. She is also able to travel to visit friends and family out of state.

While there may not be a financial incentive for Ms. Perryman to return to an occupation, since she receives approximately $5,000.00 per month while on claim and has moved to Texas to live with her mother during the course of her claim, it is Ms. Perryman's *ability* to work that determines whether or not she continues to receive benefits.

Based upon the information in Ms. Perryman's file, we believe it is reasonable to conclude that she has at least sedentary work capacity of an 8 hour day and there are occupations for which she is well-qualified that would provide her with the 80% indexed income as outlined by her policy.

Therefore, we are upholding our prior decision to close her claim. ...

(Emphasis in original).

- 37 -

Discussion

In light of the parties' stipulation that the Court's review is *de novo,* the Court's function is to "evaluate whether the plan administrator correctly or incorrectly denied benefits[.]" Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006). Under this standard, Provident's evaluation of the evidence is not accorded any deference or presumption of correctness. Hoover v. Provident Life and Accident Ins. Co., 290 F.3d 801, 809 (6th Cir. 2002); *accord*, Locher v. UNUM Life Ins. Co. of America, 389 F.3d 288, 296 (2nd Cir. 2004).

The operative issue before the Court is whether Perryman has met her burden of establishing by a preponderance of the evidence that she is disabled within the meaning of the insurance policy's "any occupation" disability provision during the operative time period. While the parties have raised various areas of dispute, the Court concludes that it need only discuss several main issues in order to determine Perryman's eligibility for benefits: whether Perryman retained the ability to work notwithstanding her impairments; whether Perryman can meet the earnings and vocational requirements of the policy; and whether the mental limitations provision of the policy bars Perryman's claim.[8]

A. Perryman's Ability to Work

(1) Medical evidence of CFS

Although Provident would have this Court make the factual finding that Perryman does not have CFS, the Court declines to make such a finding based

---

[8]

The Court notes that it has intentionally not discussed every argument raised by the parties and that those arguments not discussed are considered by the Court to be unpersuasive, cumulative, not relevant, or otherwise not necessary to the resolution of this action.

on the record before it.  Given that Drs. Fioramonti, Hansen, and Shinkawa, Perryman's treating physicians, diagnosed Perryman has having CFS based on her subjective history and their physical examinations of her, that Dr. Harris, the rheumatologist who performed an IME on Perryman at Provident's request, concluded that she had features of CFS, and that Dr. Curtis, Provident's in-house medical consultant, conceded that Perryman meets the vague criteria for CFS, the Court assumes for purposes of this opinion that Perryman is afflicted with CFS.

But since a mere diagnosis of a condition such as CFS is not determinative of disability for purposes of ERISA disability benefits, Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by itself establish disability[,]") the initial issue that the Court must resolve is whether Provident correctly denied long-term disability benefits to Perryman in part because it concluded that she has the capacity to perform at least sedentary work for an eight-hour day even with her impairments.  The Court concludes that the record, viewed as a whole, does not support Provident's contention; rather, the evidence supports Perryman's contention that her impairments render her incapable of performing even sedentary work on a full-time, consistent basis.

(2)  Perryman's subjective complaints as evidence of disability

Perryman's testimony that she is so disabled by her impairments that she is incapable of working at any job on a sustained basis constitutes evidence that the Court must consider.  The Court is not, however, required to blindly accept Perryman's subjective reports of disabling fatigue and related symptoms. Because the Court concludes that it is entirely appropriate to require that

Perryman meet her burden of establishing that she is disabled by providing

sufficient objective evidence of her functional limitations or restrictions that render

her disabled from working, Perryman's subjective evidence is persuasive only to

the extent it is corroborated by other evidence of medically documented

impairments showing that she has functional limitations or restrictions that render

her disabled from working.[9]  *See e.g.,* <u>Williams v. Aetna Life Ins. Co.</u>, 509 F.3d

_____

[9]

     To the extent that it is an issue, the Court concludes that Perryman cannot be denied benefits merely based on any failure on her part to produce objective medical evidence of the etiology of her CFS because Provident's policy has no such requirement. *See* <u>Canseco v. Construction Laborers Pension Trust of Southern California</u>, 93 F.3d 600, 608 (9th Cir.1996) (Court noted that the principle that an ERISA plan administrator may not impose a condition for eligibility not imposed by the plan language has been extended to disability benefits.), *cert. denied*, 520 U.S. 1118 (1997); <u>Maronde v. Sumco USA Group Long-Term Disability Plan</u>, 322 F.Supp.2d 1132, 1139 (D.Or.2004) ("Unless a plan contains specific requirements for objective medical evidence, a plan administrator cannot deny a claim for CFS simply because the plaintiff presents no such evidence.")  While the policy provides that Provident can require evidence of disability "satisfactory" to it, that is insufficient to require that Perryman submit objective medical evidence establishing the etiology of her CFS. *See* <u>Rochow v. Life Ins. Co. of North America</u>, 482 F.3d 860, 865-66 (6th Cir.2007) (Court noted that a policy that required "satisfactory proof" of disability did not even require medical evidence of disability.); *see also,* <u>House v. Paul Revere Life Ins. Co.</u>, 241 F.3d 1045, 1048 (8th Cir. 2001) (Court, in concluding that the evidence did not support the denial of disability benefits, noted that the insurer could not reject the claimant's evidence of disability as subjective and insist upon objective medical evidence because nothing in the terms of the plan, which merely reserved the insurer's right to demand that a claim be supported by a medical examination or written proof, supported its demand for objective medical evidence.); <u>Creel v. Wachovia Corp.</u>, 2009 WL 179584, at *8 (11th Cir. Jan. 27, 2009) (Court noted that the plan administrator's decision to deny a disability claim based on a lack of objective medical evidence was both "wrong and unreasonable" because the plan, while noting various types of evidence that the administrator could require a claimant to produce, including a catch-all category of "other forms of objective medical evidence," did not "mandate that

317, 322-23 (7th Cir.2007) (Court noted in a CFS disability case that a distinction exists between the amount of fatigue an individual experiences, which is entirely subjective, "and how much an individual's degree of ... fatigue limits his functional capacities, which can be objectively measured. Other circuits have drawn this same distinction."); Linich v. Broadspire Services, Inc., 2009 WL 775471, at *14 (D.Ariz. March 23, 2009) ("There is a world of difference between requiring Linich to prove the accuracy of her CFS or Fibromyalgia diagnosis with something like a simple blood test, which does not exist, and requiring Linich to submit additional evidence, objective or otherwise, in order to verify the severity of her symptoms. The latter would be [a proper] request, while the former would not.")

(3) Treating physicians' opinions as corroborating evidence of disability

There is no dispute that the opinions of Perryman's treating physicians, if taken at face value, fully support Perryman's disability claim. Provident, relying largely on the opinion of Dr. Curtis, its in-house medical consultant, argues that the opinions of Perryman's treating physicians do not constitute credible evidence supporting Perryman's alleged CFS-based disabling restrictions and limitations because their opinions are in effect memorializations of her self-reported complaints rather than opinions formed from the results of objective clinical evidence stemming from standard diagnostic tests. While the often conclusory

claimants produce any specific kind of evidence to establish a successful disability claim.") *Cf.* Merrick v. Paul Revere Life Ins. Co., 500 F.3d 1007, 1013 (9th Cir. 2007) (In a CFS disability case in which Provident was a defendant, the court affirmed in part a decision for the plaintiff, noting that the jury "could have found that the insurers misrepresented the terms of the policy by requiring [the plaintiff] to present 'objective medical evidence' of his disability.")

1  nature of the medical reports in the record is of concern to the Court, the Court is

2  unpersuaded by Provident's contention it should discount virtually all of the

3  medical evidence provided by Perryman's treating physicians.

4      First, while a finding that Perryman is disabled from working is clearly not

5  mandated merely because her treating physicians have so opined since the Court

6  is not required under ERISA to accord special deference to the opinions of her

7  treating physicians, <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834,

8  123 S.Ct. 1965, 1972 (2003), the Court may nevertheless give significant weight

9  to the opinions of Perryman's treating physicians to the extent that they merit it in

10 light of such factors as the length and nature of the doctor-patient relationship,

11 the level of the doctor's expertise, and the compatibility of the doctor's opinion

12 with the other evidence. <u>Jebian v. Hewlett-Packard Co. Employee Benefits</u>

13 <u>Organization Income Protection Plan</u>, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003)

14 (The court noted post-<u>Nord</u> that "[o]n *de novo* review, a district court, may, in

15 conducting its independent evaluation of the evidence in the administrative

16 record, take cognizance of the fact (if it is a fact in the particular case) that a

17 given treating physician has a greater opportunity to know and observe the

18 patient than a physician retained by the plan administrator.") (internal quotation

19 marks omitted), *cert. denied*, 545 U.S. 1139 (2005); *accord*, <u>Paese v. Hartford</u>

20 <u>Life & Accident Ins. Co.</u>, 449 F.3d 435, 449 (2nd Cir.2006) ("[W]hile <u>Black &</u>

21 <u>Decker</u> holds that no special deference [to the opinions of the claimant's treating

22 physicians] is required, this does not mean that a district court, engaging in a *de*

23 *novo* review, cannot evaluate and give appropriate weight to a treating

24 physician's conclusions, if it finds these opinions reliable and probative.")  In

25 weighing the evidence of non-disability rendered by Dr. Curtis, Provident's in-

26

- 42 -

house medical consultant, the Court has taken into account the fact that Dr. Curtis' opinion was based only on a review of Provident's claim file on Perryman whereas Perryman's treating physicians collectively saw her literally dozens of times over the course of several years and all concluded that she is disabled from working. *See* Boyles v. Unum Life Ins. Co. of America, 2006 WL 3405011, *6 (C.D.Cal. November 20, 2006) (Court stated in an ERISA *de novo* review case that "[t]he Court gives greater weight to the conclusions of plaintiff's treating physicians, who repeatedly saw and examined plaintiff, than the conclusions of Unum's nurses and doctors, who never examine plaintiff personally.")

Second, the Court cannot discount the opinions of Perryman's treating physicians because they considered Perryman's subjective complaints. They necessarily had to do so in reaching their conclusions regarding the nature and extent of her impairments because it is both medically and legally accepted that CFS is largely a self-reported illness that cannot be diagnosed through any objective medical test. *See* Reddick v. Chater, 157 F.3d 715, 726 (9th Cir.1998) (Court noted that the presence of the persistent or relapsing fatigue underlying CFS "is necessarily self-reported."); Friedrich v. Intel Corp., 181 F.3d 1105, 1112 (9th Cir. 1999) ("CFS does not have a generally accepted 'dipstick' test.")

Third, while Provident is correct that the reliability of the opinions of treating physicians are suspect to the extent that they lack underlying factual support[10], *see* Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989) (Court

---

[10]

    The Court notes that it has placed no reliance on the opinions of Dr. Christine Madsen, one of Perryman's treating physicians who diagnosed her as having disabling CFS, because none of her treatment or office notes are part of the record.

1  noted that a treating physician's opinion need not be accepted if it is brief and

2  conclusory in form with little in the way of supporting clinical findings), Provident's

3  argument that there is no objective evidentiary support for the opinions of

4  Perryman's treating physicians based on appropriate clinical testing goes too far.

5  The record is in fact replete with evidence of physical examinations and various

6  clinical testing done on Perryman by her treating and examining physicians.[11]

7  The objective testing by treating physicians, however, was limited to physical

8  impairments and not mental impairments.  As Provident correctly notes,

9  neuropsychological testing for cognitive deficits and memory loss was not done

10 by anyone other than Dr. Breen, an examining psychiatrist, who found no clinical

11 basis for Perryman's allegations of confusion and short-term memory loss.  But

12 the Court is unpersuaded that the lack of objective mental testing requires it to

13 totally discount the observations of  Perryman's treating physicians who noted the

14 existence of various neuropsychological problems during their treatment of her.[12]

15

_____

[11]

16

17  For example, clinical testing is referenced in Dr. Fioramonti's records at AR 48, 479, 482, 487, and 488, in Dr. Hansen's records at AR 21, 26, 159-60, 163, 165, 166-68, 171-72, and 193, in Dr. Chune's records at AR 314, 326, and 329-30, in Dr. Harris' records at AR 87, in Dr. Craig's records at AR 490, and in Dr. Shinkawa's records at AR 311-12, 336, and 370.

18

19

Also, an article in the record on CFS from the American Association for Chronic Fatigue Syndrome that was given to Dr. Curtis, Provident's in-house medical consultant, by Provident's claims department when he was asked to do a file review on Perryman's claim, supports the view that certain of the tests that Provident now argues were not performed by Perryman's treating physicians, including SPECT scans, are not very valuable in diagnosing CFS. (AR at 397).

20

21

22

23

24

[12]

25

26  For example, Dr. Fiormonti consistently noted Perryman's symptoms of

Fourth, while the medical evidence is sparse in the sense that the notes of Perryman's treating physicians generally do not explain how the results of their clinical testing support their conclusions that Perryman is unable to work, the subjective judgments of Perryman's treating physicians formed from their overall experiences with her must be considered in evaluating their opinions of the extent and effect of her impairments. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir.1988) ("The subjective judgments of treating physicians are important, and properly play a role in their medical evaluations."); Lester v. Chater, 81 F.3d 821, 832-33 (9th Cir.1995) (Court noted that the determination of disability requires giving "weight not only to the treating physician's clinical findings and interpretations of test results, but also to his subjective judgments.")  The treating physicians' subjective judgments are especially important in this case given the subjective nature of CFS, the fact that its symptoms are sporadical inasmuch as they fluctuate in frequency and severity, and the fact that it can exist even though physical examinations may be within normal limits. *Cf.* Reddick v. Chater, 157 F.3d at 728.

Furthermore, the consistent diagnosis of CFS by Perryman's physicians and consistent observations of the manifestations of her impairments by those physicians can be viewed as objective medical evidence of her condition. *See* Lee v. Bellsouth Telecommunications, Inc., 318 Fed.Appx. 829, 837-38 (11th Cir.2009) (In ordering the payment of ERISA disability benefits to a claimant

---

short-term memory loss and confusion, and Dr. Hansen's office notes refer several times to memory problems, confusion, and anxiety.  Furthermore, Dr. Wilkinson, an examining neurologist, reported that Perryman's memory and cognitive functioning-related problems were related to her fatigue, not organic-based, and Perryman's memory and concentration-related problems were reported by people who worked with her, such as her supervisor, her administrative assistant, and her accountant.

suffering from chronic pain syndrome notwithstanding the insurer's defense that the claimant had not submitted the required objective medical evidence of her disability, the court noted that "the consistent diagnosis of chronic pain syndrome by Lee's physicians along with the consistent observations of physical manifestations of her condition do in fact constitute objective medical evidence. ... Indeed, the only evidence of a qualifying disability may sometimes be the sort of evidence ... characterize[d] as 'subjective,' such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms.")

(4) Other medically-related evidence regarding Perryman's ability to work

Other evidence in the record supports the opinions of Perryman's treating physicians that she is incapable of working full time on a sustained basis. For example, Dr. Barton, a Provident medical advisor, noted after a file review on August 4, 1997 that no work was feasible for Perryman at that time; Dr. Harris, who performed an IME on Perryman on October 17, 1997 at Provident's request, confirmed that Perryman was by then not capable of more than part-time sedentary clerical work; and Provident employee Joseph Mauvais stated in February, 1998 after conducting a filed investigation of Perryman that she was restricted at that time "from returning to work in any capacity."

In addition, the Social Security Administration determined in August, 1998, which was prior to the start of the "any occupation" disability requirement in Provident's policy, that Perryman's CFS and depression completely disabled her from engaging in any substantial gainful activity in the national economy. While that determination in no way mandates a finding that Perryman is disabled under the "any occupation" provision, Pari-Fasano v. ITT Hartford Life and Accident Ins.

- 46 -

1  Co., 230 F.3d 415, 420 (1st Cir. 2000), it nevertheless constitutes evidence in

2  Perryman's favor which the Court has considered in conjunction with all of the

3  other evidence. Calvert v. Firstar Finance, Inc., 409 F.3d 286, 294 (6th Cir.2005)

4  (Court noted in an ERISA disability case that "the SSA determination [of total

5  disability], though certainly not binding, is far from meaningless.")  The SSA

6  determination is clearly relevant in this case given that the standard used by the

7  SSA for determining that Perryman is disabled is more strict than that required by

8  the insurance plan at issue. *See* Montour v. Hartford Life & Accident Ins. Co., 588

9  F.3d 623, 635-36 (9th Cir.2009) ("Unlike the SSA, Hartford was not bound by the

10  treating physician rule, which accords 'special weight' to the opinions of a

11  claimant's treating physician. ... However, this distinction alone does not provide

12  a basis for disregarding the SSA's determination altogether, because in some

13  cases, such as this one, the SSA deploys a more stringent standard for

14  determining disability than does the governing ERISA plan.")

15          (5) The FCE

16          Provident argues that Perryman is not disabled from working under the

17  "any occupation" provision notwithstanding her complaints of CFS-related

18  impairments because the results of the FCE performed on Perryman in April,

19  1999 establish that she can perform sedentary work.[13]  While the FCE report

20

21          _____

                13

22          The Court notes that the FCE is important as it played a prominent role
    in Provident's decision to terminate Perryman's benefits.  For example, Dr. Curtis,
23  Provident's in-house physician, repeatedly referred to the FCE as indicating that
    Perryman is capable of sedentary work, that her complaints of incapacitating
24  fatigue seemed to be exaggerated in light of the FCE findings, and that the FCE
    findings give the impression that Perryman is capable of doing considerably more
25  that her self-reports might indicate; Pam Perdue's TSA reports were based on

26

                                            - 47 -

constitutes relevant objective evidence of Perryman's functional capacity, the Court is not persuaded that the FCE sufficiently demonstrates that Perryman can perform sedentary work on a consistent, full time occupational basis.

First, the value of the FCE examiner's conclusion regarding Perryman's ability to perform sedentary work is diminished to some degree because the Court cannot determine from the record how long Perryman was actually tested - while the FCE report states that the testing took place over the "course" of four hours, Perryman states in an affidavit that she did less than one hour of exercises during that four-hour period due to her need to rest. Although the FCE report states that Perryman's need for rest breaks was "taken into consideration when establishing work level for consistency," it does not explain how the results of the testing translate into the ability to work at a sedentary level on a sustained basis. *See e.g.*, Stup v. UNUM Life Ins. Co. of America, 390 F.3d 301, 309 (4th Cir. 2004) (Court concluded in a fibromyalgia-based disability case that the FCE results did not provide substantial evidence of an ability to do sedentary work because "the FCE lasted only two and a half hours, so the FCE test results do not necessarily indicate Stup's ability to perform sedentary work for an eight (or even four) hour workday, five days a week. Even if the results of the FCE had shown conclusively that Stup could perform sedentary tasks for the duration of the test, ...those results provide no evidence as to her abilities for a longer period.")

---

Perryman having the capacity to perform a sedentary job, which she based on the FCE finding; and Provident's final denial letter stated that Perryman could perform the duties of a sedentary occupation for an eight hour workday based on the results of the FCE.

Second, the FCE examiner's conclusion that Perryman can function in the Department of Labor's sedentary work classification is not supported by the results of the FCE given that the FCE examiner concluded in part that Perryman could only sit for a total of four hours during an entire workday.[14]  Since sedentary work, as defined by the DOL's Dictionary of Occupational Titles, "involves sitting most of the time," *see* Brigham v. Sun Life of Canada, 317 F.3d 72, 78 (1st Cir.2003) (setting forth the definition of sedentary work in the Dictionary of Occupational Titles), courts have concluded that a four-hour sitting tolerance is insufficient to render one capable of performing sedentary work. *See* Connors v. Connecticut General Life Ins. Co., 272 F.3d 127, 136 n.5 (2nd Cir. 2001) (Court, in vacating a judgment denying ERISA disability benefits under an "any occupation" policy, noted that the "ability to sit for a total of four hours does not generally satisfy the standard for sedentary work."); *accord*, Brooking v. Hartford Life & Accident Ins. Co., 167 Fed.Appx. 544, 548-49 (6th Cir.2006) (Court, in concluding in an ERISA disability case that the plaintiff was entitled to long-term disability benefits, determined that the plaintiff's inability to sit for more than four hours during an eight-hour day rendered her incapable of performing sedentary work.); Alfano v. Cigna Life Ins. Co. of New York, 2009 WL 222351, at *18 (S.D.N.Y. Jan. 30, 2009) (Court noted in an ERISA disability case that a sitting tolerance of "6

---

[14]

The FCE examiner's conclusion regarding the total amount of time that Perryman is able to sit during an eight-hour day is consistent with the opinions of Dr. Fioramonti, who twice opined that she could only sit for a total of four hours a day, and Dr. Harris, who also opined that she could only sit for four hours a day. Dr. Hansen opined that she could only sit for three hours a day.  No medical professional who completed a physical capacities report opined that Perryman could sit for a total of more than four hours during an eight-hour day.

- 49 -

hours per day [is] generally recognized as the minimum tolerance required for sedentary work" under the DOL's definition.)

Third, the FCE results do not contradict in any significant way the contention advanced by Perryman and her treating physicians that physical exertion causes her to be very fatigued. For example, the FCE report states that Perryman "was noted to be laboring by the end of the testing to complete activities," that "[s]he was unable to complete frequent lift tests in time frame to determine a frequent level[,]" and that her positional tolerance tests (sitting, walking, standing, bending, etc.) lasted 20 minutes prior to her needing a rest break.[15] The FCE report also does not contradict Perryman's statements in her affidavit that she did less than one hour of exercises during that four-hour period, and that she had to have a 45 minute nap after she completed 13 minutes on the treadmill before continuing with the FCE, and Provident has not controverted Perryman's statement that she was so exhausted by the end of the FCE testing that she had to spend the next four days in bed.

Fourth, the persuasiveness of the opinions of Provident's consultants who relied on the FCE to determine that Perryman can do sedentary work, *i.e.* Dr. Curtis on the medical side and Pam Perdue on the vocational side, are diminished by the fact that both were provided with inaccurate material information about the FCE results. For example, the cover letter that Provident's claims department sent to Dr. Curtis requesting that he perform a file review

_____

[15]

Perryman's fatigue upon being tested was such that the FCE examiner concluded that she could stand, walk, drive and sit for only ½ hour at a time, which is more limited in duration than her treating physicians, Dr. Fiormonti and Dr. Hansen, and the IME examiner, Dr. Harris, had previously found.

incorrectly stated that the FCE found that Perryman had the ability to sit for six hours during an entire workday (AR at 544 and 546), and Pam Perdue's first vocational report also stated that the FCE found that Perryman could sit for six hours during an entire workday.[16]  (AR at 422).

(6) Other evidence related to Perryman's ability to work

(a)  Surveillance evidence

Provident argues that the videotaped surveillance evidence of Perryman taken in July, 1998 constitutes compelling support for a denial of benefits because it revealed that Perryman was engaging in daily activities inconsistent with her self-reported complaints of disabling fatigue.  The Court does not view the limited surveillance evidence as constituting significant evidence of non-disability inasmuch as Provident has not sufficiently identified the allegedly suspect activities it observed on the surveillance videotape or explained how those activities contradict either Perryman's own reported limitations or those noted by her treating physicians, and the Court is not aware of anything in the videotape, or in the investigator's written report, that is significantly inconsistent with the other evidence of record regarding Perryman's functional capacity.  For example, while the surveillance videotape shows Perryman driving and picking up and moving some potted plants, neither she nor any of her physicians have stated that she could not drive for short distances or bend or lift at all.  In any case, Perryman's ability to perform limited and sporadic activities of daily living

_____

[16]

Perdue's typed report originally stated that the FCE found that Perryman could sit for a total of 4 hours a day but someone crossed out the "4" and handwrote "6" in its place.  Provident has not provided an explanation for the change.

- 51 -

are consistent with CFS and do not establish that Perryman can perform sedentary work on a sustained basis. *See* <u>Blau v. Astrue</u>, 263 Fed.Appx. 635, 637 (9th Cir.2008) (Court noted that a claimant's ability to perform such activities as driving, paying bills, doing taxes, shopping, doing laundry, and successfully completing real estate school were "generally consistent with the sporadic nature of CFS" as none of the activities consumed a substantial part of her day or required extended periods of concentration.); <u>Leick v. Hartford Life & Accident Ins. Co.</u>, 2008 WL 1882850, at *7-8 (E.D.Cal. April 24, 2008) (Court noted in an ERISA disability case that surveillance evidence showing the plaintiff's ability to undertake limited errands for a few hours during one of her "good days," such as driving to the store, visiting a friend, carrying a small bag, and sitting through an interview while taking numerous breaks, did not contradict evidence of total disability because it was consistent with the sporadic nature of CFS and because the ability to do sedentary work for short periods of time does not establish the ability to perform full-time consistent work.); <u>Thivierge v. Hartford Life & Accident Ins. Co.</u>, 2006 WL 823751, at *11 (N.D.Cal. March 28, 2006) (Court noted in an ERISA disability case based on CFS that evidence showing the plaintiff walking, driving, and doing errands for a couple of hours a day during five of the six days that she was under surveillance did not mean that the plaintiff was able to work an eight-hour a day job.)

(b) Perryman's previous ability to work

In arguing that Perryman is not disabled under the "any occupation" provision of the policy, Provident emphasizes that Perryman worked between 1994 and 1997 and earned hundreds of thousands of dollars despite her contention that she has been suffering from CFS since June, 1994. While the

1  basis for this argument is factually true, and thus of concern to the Court, it is not
2  so persuasive as to make Perryman's subjective complaints or the opinions of her
3  treating physicians significantly unreliable.

4      First, Provident's argument overlooks significant evidence in the record
5  about the serious problems Perryman had working in the post-June 1994 time
6  frame.  For example, Dr. Fioramonti's medical notes for February 23, 1995 refer
7  to Perryman's CFS as "waxing and waning," that her work schedule of 10-12
8  hours a day was "clearly beyond her capability at this point in time and is going to
9  be detrimental to her physical and emotional health[,]" and his notes for May 25,
10  1995 refer to her CFS as being improved due to "modification of lifestyle" that
11  resulted from her being able to delegate some of her responsibilities to managers
12  and cut her work down to 4-6 hours per day.

13      Evidence from Perryman's co-workers also shows that she was struggling
14  at work as a result of her illness.  For example, Michael Tousley, Perryman's
15  supervisor, stated that Perryman stayed around longer than she should have
16  because he had to continuously cover for her during her last four or five months
17  of work as she could not remember anything that was going on, and Lucinda
18  Jensen, Perryman's administrative assistant, stated that Perryman attempted to
19  work from home as she became sicker but that there were days when she was
20  too fatigued or sick to get out of bed, and that she was having memory problems
21  during that time.

22      Second, Provident's argument regarding the amount of money Perryman
23  was earning after first being diagnosed with CFS overlooks the fact that
24  Perryman's commissions-only income was based in part on a percentage of the
25  sales made by the sales staff she supervised, not just her own sales efforts, and
26

1 it was also based in part on deferred compensation.

2     Third, the fact that Perryman continued to work after being diagnosed with
3 CFS is not determinative since numerous courts have recognized that a disability
4 claimant can still be found to be disabled even if he or she worked for some
5 period after the onset of disability. *See e.g.*, <u>Hawkins v. First Union Corp. Long-</u>
6 <u>Term Disability Plan</u>, 326 F.3d 914, 918 (7th Cir.2003) (Court noted in an ERISA
7 fibromyalgia case that there is no "logical incompatibility between working full
8 time and being disabled from working full time" because "[a] desperate person
9 might force himself to work despite an illness that everyone agreed was totally
10 disabling. Yet even a desperate person might not be able to maintain the
11 necessary level of effort indefinitely. ... A disabled person should not be punished
12 for heroic efforts to work by being held to have forfeited his entitlement to
13 disability benefits should he stop working.") (citations omitted); <u>Rochow v. Life</u>
14 <u>Ins. Co. of North America</u>, 482 F.3d 860, 865 (6th Cir.2007) (Court concluded that
15 the fact that a disability claimant remained on the payroll subsequent to the
16 alleged disability onset date is not determinative as to whether he was disabled
17 during that time.); <u>Wilson v.  John C. Lincoln Health Network Group Disability</u>
18 <u>Income Plan</u>, 2006 WL 798703, at *8 (D.Ariz. March 28, 2006) (In determining
19 that the plaintiff was entitled to long-term disability benefits, court noted that it "is
20 not true" that one can never work while disabled.)

21 B.  Whether Perryman Can Meet the Policy's Vocational Requirements

22     Provident concluded that Perryman was not disabled under the terms of
23 the policy not only because it believed that she could do sedentary work for eight
24 hours a day, but also because it believed that there are occupations for which she
25 is well-qualified that would provide her with the 80% of indexed income as

26

1 required by the policy.  The Court concludes that Provident's determination on
2 this issue is not supported by the record.

3        (1) Interpretation of "80% of Indexed Earnings" provision

4        Perryman argues, and the Court concurs, that she can be found to be
5 disabled under Provident's policy even if it is assumed that she can perform
6 sedentary work because the policy's definition of disability also includes a
7 vocational requirement, *i.e.*, the policy's requirements for "any occupation"
8 disability include in part the inability of the claimant to earn at least "80% of
9 Indexed Earnings from any occupation [the claimant is] reasonably fitted by
10 education, training, or experience." *See* <u>Volynskaya v. Epicentric, Inc. Health &</u>
11 <u>Welfare Plan</u>, 2007 WL 3036110, at *10 (N.D.Cal. Oct. 16, 2007) (Court noted in
12 an ERISA disability case that even if the plaintiff could perform sedentary work
13 notwithstanding her fibromyalgia and CFS, such a finding was not equivalent to a
14 finding that she could perform her own occupation and earn more than 80% of
15 her pre-disability earnings.); <u>Crider v. Highmark Life Ins. Co.</u>, 458 F.Supp.2d 487
16 (W.D.Mich. 2006) (Court found that the plaintiff was entitled to ERISA disability
17 benefits notwithstanding that he could do sedentary work because he was unable
18 to earn 80% of his indexed pre-disability earnings as required by the policy.)  The
19 parties disagree as to whether this income-related provision is based on a
20 claimant's pre-disability income.  The Court agrees with Perryman that it is so
21 based.

22        In the Ninth Circuit, under the *de novo* standard of review, ERISA
23 insurance policy provisions are to be construed in accordance with the rules
24 normally applied to insurance policies, <u>Lang v. Long-Term Disability Plan of</u>
25 <u>Sponsor Applied Remote Technology, Inc.</u>, 125 F.3d 794, 799 (9th Cir.1997), *e.g.*
26

provisions must be interpreted in an "ordinary and popular sense as would a person of average intelligence and experience," and ambiguous language is construed against the insurer and in favor of the insured.  McClure v. Life Ins. Co. of North America, 84 F.3d 1129, 1134 (9th Cir.1996) (brackets omitted); *accord*, Feibusch v. Integrated Device Technology, Inc. Employee Benefit Plan, 463 F.3d 880, 886 (9th Cir.2006); Raithaus v. UNUM Life Ins. Co. of America, 335 F.Supp.2d 1098, 1123 (D.Haw.2004).  This latter doctrine of *contra proferentem* requires courts to adopt the reasonable interpretation of a policy provision advanced by the claimant. Lang, 125 F.3d at 799.

The Court interprets the "80% of Indexed Earnings" provision to mean that Perryman is disabled under the "any occupation" provision if her impairments restrict her from earning more than 80% of her averaged pre-disability earnings, as adjusted for inflation, in any job for which she is reasonably fitted by education, training, or experience.  This interpretation is based on the following pertinent policy definitions:

"Any Occupation Income Level" is defined in relevant part as being:

> ***80% of Indexed Earnings from any occupation you are reasonably fitted by education, training, or experience.***

"Indexed Earnings" is defined in relevant part as being:

> ***[Y]our Earnings adjusted by the rate of increase in the CPI-W.***  During the first year of Disability, your Indexed Earnings are the same as your Earnings.  After that, the Indexed Earnings are determined on each anniversary of your Date of Disability by increasing the previous year's Indexed Earnings by the rate of increase in the CPI-W for the prior calendar year. ...

"Earnings" is defined in relevant part as being:

> ***[Y]our base rate of monthly pay from the Employer Participant ... in effect just prior to the date of disability.***

- 56 -

> Such pay includes commissions and cash bonuses, but excludes overtime pay or any other special pay.
>
> If all or part of the [sic] your pay is from commissions or cash bonuses, such compensation received from the Employer Participant will be averaged over the lesser of the two prior calendar years worked just prior to the date you became Disabled, or the number of months worked just prior to the date you became Disabled.

(Emphases added).  Provident's contention that the "any occupation" provision means that a claimant who can earn 80% of the earnings from any occupation for which she is reasonably qualified is not entitled to disability benefits under the policy cannot be reconciled with the plain meaning of the policy's defined terms. What changes in the policy between "own occupation" disability and "any occupation" disability is not the definition of "80% of Indexed Earnings" - that definition is the same for both "own occupation" and "any occupation" benefits and is based on pre-disability earnings.  What changes is the occupation to which the amount constituting 80% of pre-disability earnings is applied - for "any occupation" benefits that amount is applied to any job for which the claimant is reasonably qualified.

(2) Perryman's earnings potential

Perryman argues that the evidence of record does not support Provident's contention that she can meet the "80%" earnings requirement for non-disability notwithstanding her impairments.  The Court concurs.

There is no dispute that Perryman's average monthly commissions-based income for the two years prior to her disability was $18,966 per month, for a total of pre-disability annual income of $227,592, or that 80% of that amount is

$182,073 (prior to being adjusted for inflation).[17]  There is also no dispute that the first TSA submitted to Provident by its in-house vocational consultant, Pam Perdue, noted that jobs available to Perryman paid between $27,872 and $34,944 per year, which is less than 15% of Perryman's pre-disability income.  It is further undisputed that Provident's appeals consultant Darragh Ferranti used the 80% of pre-disability earnings formulation in her December, 1999 recommendation that Provident resume paying Perryman benefits under the "any occupation" provision; Ferranti noted in that recommendation that Perryman's "high level of pre-disability income makes it difficult to support that she could earn the contractual requirement with sedentary work capacity[.]"

The only vocational information in the record that provides any support for Provident's position regarding Perryman's earnings potential is Perdue's second TSA, which noted for the first time the existence of executive marketing and insurance jobs the median pay for which (with bonuses) was between $137,500 and $248,850.  While Provident specifically relied on this vocational information in determining that Perryman was not disabled as defined by the policy, the Court is not persuaded that this second TSA constitutes sufficiently reliable evidence on which to support a denial of benefits.

First, the second TSA, like the first one, is based on a mistaken belief that the FCE validly concluded that Perryman meets the requirements for sedentary

---

[17]

While neither party cites to any evidence in the record as to the relevant CPI-W figures, the CPI-W figures available from the DOL's Bureau of Labor Statistics website show that the CPI-W for the "not seasonally adjusted, U.S. city average for all items" increased 1.5% between May, 1997 and May, 1998, and 2.1% from May, 1998 to May, 1999.

- 58 -

work.

Second, there is no sufficiently reliable explanation in the record as to what changed in the seven months between the two TSAs that caused Perdue to so drastically change her opinion regarding Perryman's earning capacity, *i.e.*, from the $28,000 to $35,000 range to the $137,000 to $249,000 range.

Third, as argued by Perryman and not controverted by Provident, the methodology employed by Perdue to generate the second TSA is suspect. Rather than basing it on her analysis of Perryman's transferable skills, Perdue wrote it based on Provident asking her "to produce wage information for executive/management type positions that would allow claimant to use the insurance, sales, and management experience and travel minimally." (AR at 555). The report contains no discussion as to whether Perryman's education, training, or experience reasonably fitted her for any of the types of jobs noted therein.[18]

Fourth, there is no sufficient evidence in the record that Perryman is in fact reasonably qualified for any of the jobs mentioned in the second TSA that meet the compensation-level requirement pertinent to the "any occupation" aspect of the policy. For example, even if the employment information that an UNUM/Provident sales recruiter provided to Perdue, *i.e.,* "executive type occupations such as VP National Accounts, VP Marketing, and VP Market Management in a home office type environment" which would have a base salary range of "$90-$150 thousand with bonus potential of 20-25%", was sufficient to

_____

[18] The Court notes that the Social Security Administration, in granting disability benefits, concluded that Perryman did not have "transferable skills to perform other work within her physical and mental residual functional capacity."

1 meet the 80% of pre-disability income requirement, which the cited jobs would do

2 only if the highest bonuses were paid, there is no evidence that Perryman is

3 reasonably fitted for any of these VP positions given her limited occupational

4 background, *i.e.*, someone with no college degree and with managerial

5 experience limited to being a district manager supervising some 20 insurance

6 agents.  As noted by GENEX in a December, 1998 report to Provident, one of the

7 barriers to Perryman's return to work was that she "has limited education,

8 training, and a very limited employment history."   Furthermore, the relevance of

9 other higher-paid positions referred to in the second TSA is questionable in that

10 they are the result of an Internet search using a Wall Street Journal source that

11 was based on a survey of median salaries in the financial services industry, a

12 different industry from that in which Perryman has had any training and

13 experience.

14 C. Mental/Nervous Disorders Limitation

15       Provident briefly argues that the policy's 24-month benefit cap for

16 disabilities caused by mental or nervous disorders constitutes a "stand-alone,

17 independent, mutually exclusive basis" on which to deny disability benefits to

18 Perryman.[19]  The gist of Provident's contention is that Perryman is not in any

19 _____

20     [19]

21       Section V of the policy, entitled "Exclusions and Limitations," contains
a limitation for Mental and Nervous Disorders which states in relevant part:
22

23     Payment of LTD Monthly Benefits is limited to the duration shown in
    Section II- Schedule of Insurance [*i.e.* 24 months of benefits] for
24     each Disability caused or contributed to, directly or indirectly, by a
    Mental or Nervous Disorder. ...
25

26     Mental and Nervous Disorders mean physical, mental, emotional,

- 60 -

case entitled to any further disability benefits because there is medical evidence in the record that she suffers from a mental disorder and she has already been paid 24 months of benefits under the policy's "own occupation" provision. The Court rejects this argument as being contrary to the policy's language and the medical evidence.

First, the Court notes that Provident did not rely on this provision to deny benefits to Perryman. Provident's letter denying Perryman's appeal does not refer to the mental disorder limitation, and while the limitation is mentioned in the initial claim denial letter, it was not invoked as a basis for denying the claim. This was made clear by Gwendolen Alegre, Provident's disability claims representative who authored the initial claim denial letter, who specifically testified at her deposition that the mental and nervous disorder limitation was not one of the bases Provident used for terminating Perryman's benefits. (Alegre's depo. at 128). Furthermore, Joseph Randza, a Provident employee who advised claims representatives on managing and evaluating disability claims, testified at his deposition that the May, 1999 denial letter referred to the mental and nervous disorders limitation not because a decision had been made that the limitation applied to Perryman but rather to ensure that Provident "stated all of the particulars of the contract" whether or not they applied specifically to Perryman. (Randza depo. at 37-38). *See* 29 C.F.R. § 2650.503-1(g) (Requiring an ERISA plan administrator to provide a written notification of a claim denial that includes

---

behavioral, or stress-related disorders caused or contributed to, directly or indirectly, by a mental or nervous condition, as classified in the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM) in effect as of the Date of Disability.

the specific reasons for the denial and to reference the specific plan provision on which the denial is based.); Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan, 349 F.3d at 1104 (Court noted that its refusal to allow disability claimants to be "sandbagged" by a rationale that the plan administrator adduced only after suit was commenced "parallels the general rule that an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself, not a subsequent rationale articulated by counsel.") (Internal quotation marks omitted).

Second, Provident's argument is bereft of any discussion of the proper interpretation of the policy's mental/nervous disorder limitation. The Court interprets the provision as not being applicable to mental/nervous impairments that are secondary to a physical impairment. *See* Friedrich v, Intel Corp., 181 F.3d at 1112 (In a case involving a plan that excluded from coverage any disability that "arises out of, relates to, is caused by or results from ... mental, emotional or psychiatric illness or disorder of any type[,]" the court rejected the insurer's argument, which was that the plaintiff was barred from obtaining disability benefits for his CFS because he had a psychiatric condition and not a physical disability, on the ground that the evidence from the plaintiff's treating physicians was that the plaintiff's psychiatric problems were secondary to his physical problem of CFS, *i.e.* that CFS caused his psychiatric symptoms.); Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc., 125 F.3d at 799 (In a case in which the plan administrator terminated disability benefits based on its conclusion that the plaintiff's depression and anxiety associated with her fibromyalgia triggered the plan's two-year benefits limitation on disabilities that were "caused or contributed to" by a "mental disorder," the

1   court, concluding that the provision was ambiguous and construing it against the

2   insurer under the doctrine of *contra proferentem*, found that the benefits had been

3   improperly terminated because "the phrase 'mental disorder' did not include

4   'mental' conditions resulting from 'physical' disorders."); *accord*, <u>Gemmel v.</u>

5   <u>Systemhouse, Inc.</u>, 2009 WL 3157263, at *17 (D.Ariz. Sept. 28, 2009) ("The

6   [ERISA] Plan does not specify what is to happen if a disorder is only partially

7   attributable to mental illness.  Therefore, the Plan must be construed to mean

8   that, if there is a verifiable physical component to the impairment, the Plan's 24-

9   month limitation [for mental health-based disabilities] does not apply and benefits

10   are payable."); <u>Lamarco v. CIGNA Corp.</u>, 2000 WL 1456949, at *7 (N.D.Cal.

11   Sept. 25, 2000) (Court concluded that disability benefits were improperly

12   terminated after 24 months based on a mental disorder limitation provision

13   because the record established that the plaintiff's mental impairments were a

14   result of her physical disorders, which included fibromyalgia.)

15        Third, the medical evidence does not support Provident's argument

16   inasmuch as it shows that Perryman's depression-related symptoms have been

17   secondary to her CFS.  For example, both Dr. Fioramonti and Dr. Shinkawa

18   expressly so stated, and the Social Security Administration's ALJ so found.

19   Furthermore, Dr. Wilkinson concluded that Perryman's memory and cognitive-

20   related problems were not organic based, but were the result of her fatigue, and

21   Provident's in-house psychologist, Dr. Pendergrass, concluded that there was no

22   evidence that Perryman suffered from any identifiable psychiatric condition, as

23   did Dr. Breen, the psychiatrist who examined Perryman for the SSA.  While Dr.

24   Curtis, Provident's in-house occupational health medical reviewer, suggested that

25   Perryman's symptoms could possibly be caused by her depressed mood, he

26

expressly stated that he was not presuming to offer a mental health diagnosis.

D. Attorney's Fees and Costs and Pre-judgment Interest

Perryman has requested that she be awarded her attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1). Ordinarily, an ERISA plaintiff who prevails in her litigation to recover wrongfully withheld benefits is entitled to attorney's fees unless special circumstances would render such an award unjust. <u>Honolulu Joint Apprenticeship and Training Committee of United Ass'n Local Union No. 675 v. Foster</u>, 332 F.3d 1234, 1239 (9th Cir.2003). Since Perryman is the prevailing party on her ERISA claim and there are no special circumstances known to the Court that make an award of fees and costs to her unjust, the Court concludes that Perryman is entitled to such an award. The attorney's fees to be awarded to Perryman shall be limited to those reasonably incurred during the litigation of this action. <u>Dishman v. Unum Life Ins. Co. of America</u>, 269 F.3d 974, 987 (9th Cir.2001) (ERISA does not allow for reimbursement of attorney's fees incurred during administrative claim proceedings prior to suit.)

Perryman has also requested that she be awarded pre-judgment interest on all benefits owing her pursuant to A.R.S. § 20-462. The Court may award pre-judgment interest on an award of ERISA benefits at its discretion. <u>Blankenship v. Liberty Life Assurance Co. of Boston</u>, 486 F.3d 620, 627 (9th Cir. 2007). Having considered the equities of this action, the Court concludes that pre-judgment interest is necessary to fully compensate Perryman. The Court cannot conclude, however, that any such award should be at the Arizona statutory rate and the Court will instead award pre-judgment interest at the rate prescribed by 28 U.S.C. § 1961. *Id.* at 628 (Generally, the interest rate prescribed for post-judgment interest by 28 U.S.C. § 1961 is the proper rate for pre-judgment interest unless

1 the Court finds by substantial evidence that the equities of this action require a

2 different rate.); *accord*, Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d

3 1154, 1164 (9th Cir.2001).

4 Summary

5       The Court concludes that the evidence of record establishes that Provident

6 erred in denying long-term disability benefits to Perryman under the "any

7 occupation" provision of Provident's policy and that Perryman is entitled to the

8 payment of such benefits from the commencement of the "any occupation"

9 requirement through the date of her 65th birthday.

10       Because the Court is not in a position at this time to determine the exact

11 amount of those benefits, the Court will require the parties to confer regarding the

12 wording of a proposed judgment.  In addition to discussing the amount of

13 benefits, the parties shall confer regarding the amount of the reasonable

14 attorney's fees and non-taxable expenses to be awarded to Perryman.[20]  The

15 parties shall also confer regarding the appropriate pre-judgment interest rate and

16 start date.  While the Court expects the parties to make every reasonable effort to

17 resolve all remaining issues through the joint submission of a proposed judgment,

18 if the parties, after a good faith effort to do so, cannot agree on the wording of a

19 proposed judgment, the parties may separately submit a proposed form of

20 judgment, accompanied by a memorandum of points and authorities that sets

21 forth the party's position regarding the amount of benefits and the pre-judgment

22 interest issue.  Therefore,

---

23    [20]

24       If the parties cannot agree as to the amount of attorney's fees and non-

25 taxable expenses due Perryman, the matter will be resolved post-judgment
pursuant to the procedure set forth in LRCiv 54.2.

26

1        IT IS ORDERED that plaintiff Nancy Perryman is awarded long-term

2   disability insurance benefits pursuant to the "any occupation" provisions of

3   defendant Provident Life and Accident Insurance Company's LTD Policy #120057

4   from June 1, 1999 through the date of her 65th birthday.

5        IT IS FURTHER ORDERED that plaintiff Nancy Perryman is awarded her

6   reasonable attorney's fees and non-taxable expenses pursuant to 29 U.S.C.

7   § 1132(g)(1).

8        IT IS FURTHER ORDERED that plaintiff Nancy Perryman is awarded pre-

9   judgment interest at the appropriate rate prescribed by 28 U.S.C. § 1961.

10       IT IS FURTHER ORDERED that the parties shall submit a proposed form

11  of judgment and any accompanying memoranda no later than March 31, 2010.

12       DATED this 18th day of February, 2010.

Paul G. Rosenblatt
United States District Judge